STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
GENERAL RESTORATION CO., INC., A CORPORATION OF
THE STATE OF NEW YORK; BARNETT LEVINE, LOUIS
PANGARO, JOHN S. ROMANOWSKI, AND JOHN F. SHEE-
HAN, DEFENDANTS-APPELLANTS.

Argued November 4, 1963—Reargued April 6, 1964—Decided
June 1, 1964.

Mr. *John E. Toolan* argued the the cause for defendants-appellants, General Restoration Co., Inc. and Barnett Levine (*Messrs. Toolan, Haney & Romond,* attorneys).

Mr. *Lewis M. Holland* argued the cause for defendant-appellant Louis Pangaro (*Messrs. Warren, Chasan, Leyner & Holland,* attorneys; *Mr. Holland,* on the brief).

Mr. *Frederick J. Fox* argued the cause for defendant-appellant John S. Romanowski.

*Mr. Maurice M. Krivit* argued the cause for defendant-appellant John F. Sheehan (*Messrs. Krivit & Krivit,* attorneys; *Mr. Solomon Lubow,* on the brief).

*Mr. William A. O'Brien,* Assistant Prosecutor of Hudson County, argued the cause for plaintiff-respondent; *Mr. Joseph V. Cullum* (specially retained), reargued the cause for plaintiff-respondent (*Mr. James A. Tumulty, Jr.,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

SCHETTINO, J. On April 11, 1961 the Hudson County Grand Jury indicted appellants and others charging them with violating *N. J. S.* 2A:98-1(h) in that they conspired to pervert and obstruct the laws of New Jersey by allegedly making a contract without complying with the bidding requirements of *N. J. S. A.* 18:6-25. The indictment named as defendants: (1) General Restoration Co., Inc., a corporation of the State of New York, which was the corporation with which the allegedly illegal contract was made and Barnett Levine, its president; (2) Louis Pangaro, an architect employed by the Jersey City Board of Education on a consulting basis; (3) John S. Romanowski, Business Manager of the Jersey City Board of Education and (4) George Schwartz, Augustus A. Tomauioli, Dorothy Martin, Benjamin B. Potwardoski, Arthur H. Esterly, Edmund Szymanski and John F. Sheehan, members of the Jersey City Board of Education at the time the contract was executed.

At the end of the State's case, defendants moved for acquittal. The trial court denied the request as to all defendants except the board members and, as to them, reserved its ruling. At the end of defendants' case, the trial court granted the motion for acquittal as to all board members except John F. Sheehan, the president of the board. The case was submitted to the jury which found all defendants retained in the case guilty. Appeal was taken to the Appellate Division and we certified the cause before argument there.

The following basic facts are clear. Pangaro was retained by the board as a part-time architect for which he received an annual retainer. His employment agreement did not obligate him to prepare plans and specifications or to supervise construction. On May 14, 1959 Pangaro was instructed by the board to prepare plans and specifications for the waterproofing of Public School No. 34. In the summer of 1959 the board advertised for bids on this work. On August 27, 1959 the board and Pangaro entered into a written contract providing that Pangaro would be hired to supervise the contemplated work and would be compensated for his services at a rate not to exceed six percent of the contract cost. The bids were received at the board's public meeting of September 10, 1959. General submitted the lowest bid, $15,700, and was awarded the contract on September 16, 1959. No question has ever been raised with reference to the propriety of this contract.

The specifications annexed to the contract provided that monthly payments on account would be made on the basis of 85% of the work performed and materials stored on the site at the time of certification by the architect, and that upon "substantial completion" of the contract, the contractor would be entitled to 90% of the contract price, with the 10% balance payable 30 days after "final completion and acceptance." The specifications contained the usual provision authorizing the board to alter the contract by adding or deleting work.

The specifications also provided, *inter alia,* that whenever the contractor, in performing his work, encountered steel lintels he would be required to expose each lintel to its full depth by removing the mortar or other material separating the upper surface of the lintel from the brick or stone above it, scrape and clean it free from rust "as thoroughly as possible," waterproof it, and then reseal the exposed area. A lintel is the upper horizontal member of the frame of a window or door aperture which supports the brick, stone or building superstructure above it.

A purchase order was issued to General on October 26, 1959 authorizing General to begin work immediately. The contract

called for completion of the work by November 19, 1959 but the record shows that the work had not been completed by that date.

*N. J. S.* 2A:98–1 provides in part: "Any 2 or more persons who conspire: * * * h. To commit any act for the perversion or obstruction of justice or the due administration of the laws—Are guilty of a conspiracy and each shall be punished, * * * as for a misdemeanor."

■ The State claimed that defendants had plotted to avoid the bidding requirement of *N. J. S. A.* 18:6–25 which provides in part: "No contract for the repairing of an existing schoolhouse at a cost of more than $2,000.00 shall be entered into without first advertising for proposals therefor." The purpose of this statute is to obtain the lowest bid which advertising and uninhibited competition can produce, *i. e.,* to secure competition and to guard against favoritism, improvidence, extravagance and corruption: "Statutes directed toward these ends are for the benefit of the taxpayers and not the bidders. * * *" *Hillside Tp., Union County v. Sternin,* 25 *N. J.* 317, 322 (1957); see also *State v. LaFera,* 35 *N. J.* 75, 82 (1961), and *City of Asbury Park v. Hoek,* 38 *N. J.* 213, 231 (1962).

During the pendency of this appeal the State has seen fit to alter the theory upon which it is claimed the convictions before us can be sustained. At the outset of this case (as revealed in the indictment) it was the State's position that the alleged conspiracy was born and nurtured in January of 1960 when all the defendants purportedly got together to "amend" a contract which was already completed. But by the end of the case the State had shifted its approach. It was argued in summation (and again in reargument before us) that Pangaro had so drafted the specifications in May of 1959 that the need for lintel replacement would be made known only after the original contract was entered into but before completion. The State theorized that Pangaro hoped, at the time he drafted the specifications, that an "amenable" contractor would submit the lowest bid on the repair job and that Pangaro, Romanowski, all the members of the board and the con-

tractor would then amend the contract (using the provision which allowed such alteration) and share the profits.

The State sought to show that the original contract had in fact been completed before the time the defendants, other than General and Levine, say they became aware of the need for lintel replacement. It also sought to show that the need for lintel replacement was obvious long before the original repair work was done. In this respect the State introduced the testimony of Barnett Levine given to the Grand Jury. It is asserted that the testimony shows conclusively that the need for replacement became obvious very soon after General began work under the original contract. But as we read this grand jury testimony it is not at all clear as to just when the need for replacement became obvious to Levine or his subordinates. (The prosecutor contended before the trial court that the jury could construe Levine's grand jury testimony as an admission by Levine that he knew new lintels were needed "as soon as he went on the job" but conceded "I agree it's not heavy" proof.)

Other than Levine's grand jury testimony on this point, the State offered no evidence except the inferences that might be drawn from the many documents put in evidence that any defendant knowingly sought to avoid the bidding statute by using the device of altering the original contract. Not a shred of proof was presented to show that any defendant benefited pecuniarily from the transaction; in fact, the State concedes that there was no proof of "dollar corruption."

Each defendant testified on his own behalf, and all denied any scheme or conspiracy. Among other things, the defendants claimed that their conduct was proper because it was taken on advice of counsel and because they in good faith thought that there was an immediate need to amend the existing contract.

The circumstances surrounding the amendment of the contract can be briefly summarized.

By letter dated January 8, 1960 Barnett Levine proposed to the board the installation of new lintels at P. S. 34. The

letter quoted the unit price on lintels but did not specify the number to be installed. The letter was read at a caucus meeting on January 11, 1960. Pangaro submitted an estimate on replacements to the board with a statement that the need for replacements was discovered by the contractor only after work had begun; that it was impossible to note the defects when the contract for waterproofing was first made and that the lintels were hazardous and should be replaced.

Some of the board members asked about the cost and need of replacement and inquired whether the board could legally supplement the contract without bids. The counsel to the board was consulted and apprised of the lintel situation. He was told about the original contract and advised that the suggested supplemental contract exceeded $2,000. He was informed that the price of the extras was reasonable, and that the contractor was still on the job. He testified that he recommended that the board should not only adopt a resolution authorizing the award of extra work, but should also prepare and have executed a supplemental contract covering this work in order that there might be no misunderstanding as to the respective rights and obligations of the board and the contractor. He urged the board to adopt this procedure in the handling of all contracts concerning extra work. (We note that the assistant secretary testified that during his eight years of service for the board, he knew of only one other occasion when the board had followed the procedure of executing a supplemental contract for repairs. The usual method, he stated, was for the board merely to pass a resolution authorizing the additional work.) Counsel also stated that he had prepared a resolution in accordance with his suggestions and after the board approved the resolution on January 28, 1960, a contract was prepared in conformity with the resolution by the assistant business manager who is a lawyer and was sent to counsel along with a memorandum pointing out the original contract price and the supplemental contract price, inquiring whether the supplemental contract price could be

awarded without advertising for bids. Counsel marked the memo "O.K.," initialed it, and returned it to the board.

Counsel further explained why preparation of the supplemental contract was delayed even though a claimed emergency existed. After he had given the board an opinion that a supplemental contract for lintel replacement could properly be awarded as an extra to the waterproofing contract without advertising for bids, the board adopted the resolution of January 28, 1960 as noted, and the contract was prepared. In February 1960 the Comptroller of Jersey City refused to countersign checks for the work under similar "reformed" contracts until he received an opinion from the Corporation Counsel of Jersey City as to the legality of the supplemental contract. On March 4, 1960 the Corporation Counsel presented a written opinion which the board members and their counsel took to mean that the supplemental contract method was proper. Thereafter, the lintel replacement contract was executed by General and the board.

On May 14, 1960 the board issued a purchase order authorizing General to proceed. In October 1960, after completion of the amended contract, General submitted vouchers seeking payment of the 10% balance retained under both contracts. Pangaro certified the vouchers and the board authorized payment.

Although there are several issues raised on this appeal we find it necessary to decide only one, namely: Is there sufficient evidence to sustain a judgment of conviction of conspiracy?

Several matters mystify us. We do not understand why certain officials and employees of the board were indicted while other officials and employees who participated just as much in the transactions were not. Nor do we understand under what concept the trial court dismissed the charge against all the other members of the board of education but did not do so as to President Sheehan.

The trial judge stated:

"There is still residing with the Court a motion that has not been disposed of as yet with reference to the motion for judgment of acquittal which was reserved by the Court at the end of the State's case and continued until this moment.

It has been renewed, however, by counsel for the Board members.

At the end of the State's case the Court made the observation that as a matter of law it could be that the Court could permit the case against the Board members to go to the jury as a question of fact.

However, the Court did further observe that in group action there is a possibility that some of the Board members acted *pro forma*. Their acquiescence as I said, may merely have been a formality without any notice or intention upon their part. The Court takes this position, even though the legal position as advanced by the State is that it could go to the jury as a matter of law.

However, with the number of defendants here, I do think that there could be an injustice to one or more of the defendant Board members. Therefore, the Court withheld the motion until each of the Board members had the opportunity if he or she availed themselves of said opportunity to state under what conditions they passed the resolutions which may have been part of this conspiracy.

I have spent considerable time in analyzing the testimony and my notes, particularly over the weekend with reference to the Board members.

As to Mr. Esterly and Mr. Potwardoski, I must come to the conclusion that it would be an injustice to permit their case to go to the jury, and I have no hesitation in granting a motion for judgment of acquittal as to those two named defendants.

I have taken a second category, namely Mrs. Martin and Mr. Tomaiuoli. I find that their culpability is perhaps a little bit more knowing, shall I say, than Mr. Potwardoski and Mr. Esterly. But even in their case I must say that it would be an injustice to have their case go to a jury, and I hereby grant a motion for judgment of acquittal.

The next category, Mr. Romanowski—and I want you to understand this is the Court's category of evidence.

MR. CULLUM: Mr. Romanowski?

THE COURT: I'm sorry. Mr. Schwartz and Mr. Szymanski. Their culpability and involvement seemed to the Court greater than the other four. And yet after great consideration, I must come to the conclusion, although there are various avenues that could be opened up which weren't, I must come to the conclusion that it would be equally an injustice for their cases to go to the jury, and I hereby grant a judgment of acquittal to Mr. Szymanski and to Mr. Schwartz.

As to the President, John F. Sheehan, I cannot grant a judgment of acquittal. Mr. Sheehan's activities in three areas alone surpasses the sum total of the evidence of the other defendants, and that his acquiescence to the resolution of the Board, in my opinion, was not *pro forma*, was not a formality, but there are sufficient facts from

which the jury may infer in his case that if there was a conspiracy that he was part and parcel of that conspiracy.

His explanation of the corporation counsel's letter to the Board, the resolution, his signing the contract in May, might be—all in all, I feel that this case must go to the jury, and a judgment of acquittal will be denied in his case.

We are now confronted with the defendants General Restoration Co., Barnett Levine, Louis Pangaro, John S. Romanowski and John F. Sheehan.

Will you bring back the jury and I will instruct them."

We are not at all impressed with the attempted distinctions.

The increased use of the conspiracy doctrine has coincided with the growth of criminal activity since the seventeenth century and the contemporary tendency to identify criminal law with morality. "Criminal Conspiracy," 72 *Harv. L. Rev.* 921 (1959). Several factors contributed to the growth including the public concern with the corporate practice of crime and the existence of criminal groups which provide a convenient forum for the birth of additional corrupt activity not envisioned when the group was formed.

 As Chief Justice Weintraub has stated "the gist of the offense [of conspiracy] is the criminal agreement." *State v. LaFera, supra,* 35 *N. J.,* at *p.* 86. While the conspiracy statute requires an overt act the agreement alone can satisfy the act requirement because intent and act can be merged in the agreement. *State v. Carbone,* 10 *N. J.* 329, 336–37 (1952).

 In order to establish the conspiracy a series of acts constituting one scheme or having a natural connection is admissible. *State v. Yedwab,* 43 *N. J. Super.* 367, 378–9 (*App. Div.* 1957), certif. denied 23 *N. J.* 550 (1957). And while certain actions of each defendant when considered alone might appear to be innocent or insignificant, the jury may infer that the whole series of acts resulted from associated action based on prior understanding. Moreover, conviction for conspiracy can be based on circumstantial evidence, *State v. Goodman,* 9 *N. J.* 569, 581 (1952), so that the prosecutor is permitted to bring in ambiguous and somewhat unrelated

acts, statements, conversations and transactions in the hope that when viewed as a whole, the inference of a preplanned scheme will emerge. In short, when the total effect of the proof indicates sufficiently the existence of a conspiracy, the case must go to the jury. 1 *Wharton, Criminal Evidence,* § 180 (12*th ed.* 1955).

We cannot lose sight of the fact that by virtue of these rather liberal standards of proof, conspiracy has become the "darling of the modern prosecutor's nursery." *Harrison v. United States,* 7 *F.* 2d 259, 263 (2 *Cir.* 1925). Admittedly, the "new crime" is a useful and necessary weapon in combating complex criminal organization. Primarily, the concept serves a prophylactic purpose insofar as it allows the law to move against crime while it is still in the unexecuted stage. Without this device, law enforcement either must wait until a crime is committed or at least is sufficiently approached to become indictable as an attempt. Secondarily, in the event the crime is already committed, the conspiracy doctrine serves to prevent a defendant from enjoying a freedom from punishment which might otherwise be obtained due to the anonymity of his status in the group and the difficulty of tracing his particular substantive offense. See Sayre, "Criminal Conspiracy," 35 *Harv. L. Rev.* 393 (1922); Note, "The Criminal Dilemma; Prosecution of a Group Crime or Protection of the Individual Defendants," 62 *Harv. L. Rev.* 276 (1948).

In these circumstances, it is important that a court examine the record with care to see to it that there is sufficient evidence to warrant the conviction of those charged with this offense. It seems to us that the State did not meet its burden and at the end of the State's case the motions for acquittal should have been granted. As we view counsel's testimony the board was acting in accordance with its counsel's instruction. Counsel's testimony supplies the background against which the actions of the defendants become understandable. Nothing in the record indicates that counsel was duped or that he was a party to the alleged conspiracy. Even with the broadest application of proof by circumstantial

evidence, we see no basis for any possible finding that the defendants conspired to avoid the bidding statute, or that defendants conspired with corrupt motives.

Reversed.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For affirmance*—None.