STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. FRAN-
CIS HUTCHINS, A/K/A "HUTCH," ULYSSES WALLS,
NORMAN PRINCE AND ERNEST HERNDON, A/K/A
"JABO," DEFENDANTS-RESPONDENTS.

Argued April 21, 1964—Decided July 7, 1964.

*Mr. William C. Brudnick,* Assistant Prosecutor of Bergen County, argued the cause for plaintiff-appellant (*Mr. Guy W. Calissi,* Prosecutor, attorney; *Mr. Anthony D. Andora,* Assistant Prosecutor of Bergen County, on the brief).

*Mr. James A. Major,* of counsel, argued the cause for defendants-respondents (*Messrs. Major & Major,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J.  Defendants, Walls, Herndon, Hutchins, and Prince (and two others, Gramaglia and Epsaro), were indicted for "conspiring together with" Peter Foti, not named

a defendant, to conduct a lottery between January 1, 1959 and April 10, 1962 in violation of *N. J. S.* 2A:98–1 and 2. The indictment against Gramaglia was dismissed on the State's motion for *nolle prosse* and Epsaro's motion for acquittal was granted at the close of the State's case. The remaining defendants were convicted by a jury and all appealed.

The Appellate Division, in an unpublished opinion, found there was sufficient evidence of a conspiracy to convict, but reversed on the grounds that certain actions and statements of the trial court in returning the jury for reconsideration constituted plain error and that defendants' motion to suppress evidence taken from one of the defendants, Prince, should have been granted. On the State's petition, we granted certification. 41 *N. J.* 307 (1964).

On the first day of the trial, defendants made a motion to suppress evidence seized under a warrant for the search of the residence of defendant, Prince. Defendants' motion was denied as was their objection to its admissibility during the trial. (We note that *R. R.* 3:2A–6 requiring such motions to be made before trial was adopted after this trial.) The admission of other evidence against all four defendants was objected to on the ground that a conspiracy among the five had not been established by the State. Defendants' motions to acquit on the same ground were also denied.

The State's chief witness was Foti, the person with whom defendants allegedly conspired. He testified that in June or July 1961 he asked defendant Walls whether he could write numbers, and Walls told him he would let him know. The following day Walls told him he could start and supplied him with the necessary gambling paraphernalia.

Foti's description of the gambling operation was as follows: People would come to his store and select a three digit number which represented the bettor's choice of what would be the last three digits of the total amount of the pari-mutuel betting at a specific race track. The odds were 500–1. Foti would make three copies of a slip, writing the date on the top and the

amount of the wager, total the slip and give the customer the white duplicate. He retained two slips, one of which was a yellow copy which went to the gambling "bank" represented by Walls, and the other Foti kept. The day after Foti started writing numbers Walls came to the store at around 2:30 or 3:00 P. M., asked if the work was ready, received an affirmative answer from Foti, who then gave him an envelope containing the yellow slips from the daily play. On the following day, Walls brought in an adding machine tape which was described during the trial as a ribbon. On this ribbon was printed each bet made with the amount thereof and at the bottom of the ribbon these figures were totalled. Under the total would be listed the 25% commission credited and payable to Foti, and the balance was the amount due Walls. If the ribbon showed moneys coming to Foti, Walls would give it to him; if it showed money due Walls, Foti paid him. In each case the ribbon represented a tabulation of the previous day's bets. This procedure was followed each day, Sundays excepted.

In January 1962 defendant Herndon came to Foti's store and told Foti he was taking over Walls' job. He did so until some time at the end of February, when defendant Hutchins took over. The operations under Herndon and Hutchins were the same as under Walls. After only six days and during the first week in March, Hutchins brought defendant Prince to Foti and told Foti that Prince was taking over, which he did. Until Foti was arrested on April 4, 1962, the operation continued with minor variations i. e. Prince would appear in the morning and transact the money facet of the operation and "someone else" would appear about 2:30 or 3:00 P. M. to pick up the yellow slips.

On April 4, 1962 police officers, armed with a search warrant, entered Foti's store and seized certain items which were identified by Foti as follows: numbers books (marked S-1, S-2, S-3, and S-4), used to record customers' numbers bets, which were found on his person; a tally sheet (marked S-5), allegedly delivered to Foti by Prince on April 4, 1962 prior

to the raid, also found on his person (he identified numbers bets recorded on S-5, the adding machine tape, as bets from his numbers book S-1, and also from S-9) ; a business card of defendant Prince which the latter had allegedly given to Foti (marked S-6) ; $37 in cash representing the lottery receipts collected on April 4, also found on Foti's person (marked S-7) ; three "cut" cards (marked S-8), allegedly given to him by Prince on March 29, 1962 (the "cut" cards numbers had lesser odds, *i. e.,* 400 to 1 instead of 500 to 1) ; a numbers slip (marked S-9), given by Foti to one Felton Lee Willis, a bettor, on April 3; and numbers books, (marked S-16), allegedly given by Prince to Foti on April 4, 1962 to replace water-soaked books (S-2 and S-3).

Initially these materials were admitted in evidence only as against Prince because the trial court found no proof of a conspiracy but later it reversed this ruling holding that the State had produced sufficient evidence of a conspiracy by all defendants and admitted them against all defendants.

The warrant for the search of the residence of Prince was served on Prince at his front door at about 11 :15 A. M. on April 10, 1962. None of the materials seized was found in Prince's residence but they came from his person when, on orders from the raiding authorities, Prince emptied his pockets. They were six business cards of Prince and $752.24 in tens, fives, ones and some change taken from Prince's jacket and pants pockets and his wallet. These, marked in evidence as S-11 through S-14, were admitted into evidence only against Prince.

The Appellate Division first disposed of defendants' contention that the trial court erred in not dismissing the indictment at the end of the State's case for lack of proof of the alleged conspiracy. The same contention is made to us. Defendants argue, in effect, that if the dealings of Foti with each of the defendants can be called a conspiracy (which defendants deny) there were four separate conspiracies and not the one charged in the indictment; that the State was required

to prove by words or conduct that these four men agreed to conduct a lottery as that is the offense with which they are charged and which must be proved; and that there is lack of proof of that offense. We agree with the Appellate Division holding that there was sufficient evidence of one conspiracy involving Foti and all defendants.

We have recently noted in *State v. General Restoration Co., Inc.,* 42 *N. J.* 366 (decided June 1, 1964) that:

"The increased use of the conspiracy doctrine has coincided with the growth of criminal activity since the seventeenth century and the contemporary tendency to identify criminal law with morality. 'Criminal Conspiracy,' 72 *Harv. L. Rev.* 921 (1959). Several factors contributed to the growth including the public concern with the corporate practice of crime and the existence of criminal groups which provide a convenient forum for the birth of additional corrupt activity not envisioned when the group was formed.

As Chief Justice Weintraub has stated 'the gist of the offense [of conspiracy] is the criminal agreement.' *State v. LaFera,* [35 *N. J.* 75, 86 (1961)]. While the conspiracy statute requires an overt act, the agreement alone can satisfy the act requirement because intent and act can be merged in the agreement. *State v. Carbone,* 10 *N. J.* 329, 336–37 (1952)."

The State proved the making of a conspiracy agreement by Foti and Walls to violate *N. J. S.* 2A:98–1, and –2. We do not feel that the State has to prove that a conspiracy was agreed to by all five in June or July 1961 when Foti first spoke to Walls. In *State v. Carbone,* 10 *N. J.* 329, 338 (1952), we stated:

"But it is not essential * * * that all enter into the conspiratorial agreement at one and the same time. * * * 'What has to be ascertained is always the same matter: is it true to say, * * * that the acts of the accused were done in pursuance of a criminal purpose held in common between them?' [citation] One who joins a conspiracy after its formation is equally guilty with the original conspirators. * * * *State v. Lennon,* 3 *N. J.* 337 (1949)."

*Eacock v. State,* 169 *Ind.* 488, 82 *N. E.* 1039, 1045 (*Sup. Ct.* 1907) states that "A person coming into a conspiracy after it is formed and assisting in its execution is deemed a party

thereto, and is liable therefor. The coming in of such person does not destroy the identity of the conspiracy, but it continues the same conspiracy." Compare *Den ex dem. Stewart v. Johnson,* 18 *N. J. L.* 87, 89–90 *(Sup. Ct.* 1840), wherein the court stated:

"If an individual connect himself with others in a conspiracy to defraud, or for any other purpose, it would be no answer to say that the whole plan was concocted before he became an associate. By connecting himself with them, and aiding in the execution of their plan, he adopts their prior acts and declarations, so far at least as they constitute a part of *res gestae,* as his own; as much so, as if he had been present and assented to each successive step in carrying out and consummating the fraud."

As we view the record, there was only one conspiracy, the original one between Foti and Walls. Thereafter, in execution thereof Foti and Walls acted through January 1962 when Herndon took over Walls' performance and successively Walls' part of the agreement was performed by Hutchins and Prince. In order to establish the conspiracy, a series of overt acts having a natural connection is admissible. *State v. Yedwab,* 43 *N. J. Super.* 367, 378–9 *(App. Div.* 1957), certif. denied 23 *N. J.* 550 (1957). From such acts a jury could find by the circumstantial evidence approach *(State v. Goodman,* 9 *N. J.* 569, 581 (1952)), that the conspiracy continued to function with all four defendants participating in the successive operations thereof. The jury could also infer that the whole series of illegal acts resulted from associated action based on a prior understanding.

We conclude, as did the Appellate Division, that the total effect of the proof and giving the State all legitimate inferences therefrom indicated sufficiently the existence of a conspiracy and thus the case had to be submitted to the jury. 1 *Wharton, Criminal Evidence* (12 *ed.* 1955), § 180. *Cf., State v. Fiorello,* 36 *N. J.* 80, 90–91 (1961).

The Appellate Division next considered the action and remarks of the trial court when notified by the jury of a dead-

lock after four hours of deliberation. Contrary to the mandate of *State v. Pontery*, 19 *N. J.* 457, 477 (1955), that it is "improper" for a trial court "to ask the explicit numerical standing of the jury," the trial court here said "I don't care which way you are voting and I don't want to know which way the balance is but I would like to know what your vote is, how you are divided on it." It was told that the vote was 11 to 1. The trial court after remarking that that was all it wanted to know immediately stated:

"* * *, the case has been several days being tried and you have four defendants to consider, really like four cases and you have had a lengthy charge of the Court, all that has been said, and you have only had all that for consideration and deliberation for four hours plus your coffee and sandwich time when you had lunch so I think I should require you to go back and continue your deliberations for at least another hour and see what the situation is then."

Counsel for all other defendants joined an objection to these remarks by defendant Wall's counsel. We agree with the Appellate Division's comment that:

"It is difficult to determine just what [the] objection means, but it certainly did not indicate to the trial court the complaint which is now made—that sending back the jury after learning it stood 11 to 1, without a cautionary instruction, put unlawful pressure on the dissenter to agree. Nowhere in the colloquy that followed the sending back of the jury for further deliberation was this thought expressed to the trial court, and no counsel asked that the jury be discharged, or for a cautionary instruction of the type which was requested in *State v. DiModica*, 40 *N. J.* 404 (1963)."

■■ We agree that what was said by trial counsel was not enough to have alerted the court to the necessity of making it plain to the lone dissenter that he should not abandon his scruples and his conscientious conclusions in order to arrive at a verdict, and that he should only do so if further argument by the other jurors convinced him. Nevertheless, the Appellate Division applied the plain error rule, *R. R.* 1:5-1 (a), and reversed the convictions because it felt that when,

after they announce that there is only one holdout, a trial court sends them back without a cautionary instruction, it may appear to the dissenter that the judge wants him to agree and will be displeased if he does not; and thus, that it is "closely akin to unlawful compulsion," for it is probably never easy for a juror to stand alone, even when he is convinced he is right and it must be very much more difficult when it appears to him that his dissent may be looked upon with disfavor by the judge.

We disagree, however, with the application of the plain error rule in the atmosphere of this trial. The dispassionate remarks of the trial court convince us that there was no coercive element therein which could be expected to have influenced the lone dissenter into an agreement with the remaining jurors, against his or her own personal convictions.

The Appellate Division also referred to that part of *Pontery* (19 *N. J.*, at *p.* 477) wherein we stated:

"It was well within the discretion of the trial court to return the jury for further deliberation despite the fact that they had announced their inability to arrive at a verdict. And in determining whether to so exercise his discretion, the trial judge could properly inquire as to whether or not the jury entertained a predominant view without disclosing what it was. However, to ask the explicit numerical standing of the jury, as was done here, is not to be encouraged as sound judicial procedure.

This form of specific inquiry easily lends itself to suggested or apparent compulsion and should be avoided, especially where, as here, the trial judge returned the jury for further deliberation after having ascertained that they were divided eleven to one. Under the circumstances present, the absence of any cautionary instructions was closely akin to unlawful compulsion as set forth in *In re Stern*, 11 *N. J.* 584 (1953)."

The Appellate Division stated:

"The only way that we can think of in which a judge can 'inquire as to whether or not the jury entertained a predominant view without disclosing what it was' is by asking the jurors whether they are split evenly. With due respect to the Supreme Court, we suggest it might be safer not even to make such a inquiry, for it seems to us that it

invites an answer giving the 'explicit numerical standing,' and may lead a juror to blurt out the numbers even after the judge has said he does not want to hear them."

We quote at length in order to emphasize the problem which is disturbing not only to the appellate courts but also to the trial courts. We feel that the problem posed by the Appellate Division in its discussion of *Pontery* requires further consideration by this court.

■ We suggest that the following procedure be adopted when a trial court inquires into the possibility that a verdict may be reached. The trial court should admonish the jury at the very outset not to indicate how they stand as to conviction or acquittal or whether they entertain a predominant view. The foreman should be asked only whether he believes the jury might reach a verdict after further deliberations. If the trial court then feels that further deliberations might produce a proper verdict, it should send the jury back with the supplemental instruction to the effect of the one we approved in *State v. Williams,* 39 *N. J.* 471, 481 (1963) :

" 'I charge you now that it is the duty of each juror, while the jury is deliberating upon its verdict, to give careful attention and consideration to the views on the testimony of his fellow jurors. A juror should not shut his ears and stubbornly stand upon the position he first takes, regardless of what may be said by his fellow jurors. It should be your collective objective to arrive at a common conclusion whether that be innocent or guilty, and to that end you should deliberate together with calmness. It is your duty to agree upon a verdict, if that is possible. The law contemplates that you shall by discussion harmonize your views, if possible, but not that you shall compromise, divide and yield your personal convictions for the purpose of arriving at an agreement.' "

If such a procedure is followed, the fears expressed by the Appellate Division may, we hope, be completely dissipated.

■ We next consider the Appellate Division's determination of the validity of the search warrant for the premises owned by Prince. (As pointed out by defendants although the warrant in its introductory paragraph refers to the person as

well as the premises of Prince, the warrant authorizes the search of only the Prince premises of 21 Oakland Street, Englewood.) The Appellate Division stated:

"* * * Prince contends that the affidavit upon which the search warrant was issued did not establish probable cause for its issuance. The affidavit could not be found, but the prosecutor stipulated that it was made by an assistant prosecutor, and contained nothing but the following:
'I have good reason to believe and do believe that in and upon certain premises * * * and persons present upon said premises, there * * * now is located certain property used as a means of * * * gaming in violation of *N. J. S.* 2A:121, 1, 3 * * *.
That the facts tending to establish the grounds for this application and the probable cause * * * of my belief that such grounds exist are as follows: *Applicant has been informed by hitherto reliable informant that lottery slips are sold by diverse persons at the above-designated premises.'* (Emphasis ours)
"The State argues that the underlined [italicized] statement, standing alone, was sufficient to establish probable cause. We disagree."

The Appellate Division, after referring to *R. R.* 3:2A–3 and the comprehensive opinions on this subject matter by Mr. Justice Jacobs in *State v. Macri,* 39 *N. J.* 250, 257 (1963), and *State v. Burrachio,* 39 *N. J.* 272 (1963), held that:

"The underlined words of the affidavit were not sufficient to support a finding of probable cause, for they did not provide the judge [who issued the warrant] with the material upon which he could determine 'for himself the persuasiveness of the facts relied on by the complaining officer to show probable cause.' "

We agree with its conclusion that the evidence taken from Prince's premises or person if based upon this search warrant should have been suppressed.

■ The State also contends that these materials seized from Prince were "of minor, if any, importance." We disagree. It may be that Prince felt compelled to testify to explain away the great sum of money he had on his person that day and the business card, S-6, Foti had which was the same as two of the six business cards, S-13, found on Prince's

person. By testifying he subjected himself to a devastating cross-examination under which he had to admit he had been unemployed for many months and that he lived by gambling —albeit New York and not New Jersey gambling. Such testimony hardly could be found "not prejudicial."

But we are not sure from the record whether the materials seized were not the result of a search incidental to a legal arrest. The only references to the manner of serving and executing the search warrant were contained in the following excerpts of the testimony by Anthony D. Andora, an assistant prosecutor, who was sent to "Englewood to execute the warrant." His testimony is as follows:

"Q. Do you know whom that search warrant was directed to? A. It was directed to Norman Prince, 21 Oakland Street in Englewood.

Q. What time did you go to the City of Englewood? A. It was in the vicinity of 11 A. M. that we were up there.

Q. Where did you go in the City of Englewood, any particular street or address? A. Yes. We went to Oakland Street to the residence of Norman Prince at 21 Oakland Street.

Q. What if anything did you observe? A. When we arrived there we pulled up in our automobile and Mr. Prince was about to enter into his home. We got out of the car, went up to him, indicated to him that we had a search warrant, gave him a copy and he invited us into his home.

Q. What did you do then? A. He took us into the house through his kitchen into his dining room and we informed him once again of a search warrant and that we were going to conduct a search and he consented and we commenced our search at that time. The first area of the search that was conducted was on his person and he was asked to empty his pockets and he did so.

Q. Where did he do this? A. He took out the contents of his pockets, including his wallet and placed those on the dining room table and they were inventoried at that time, the contents of the pockets.

    *        *        *        *        *        *        *        *

Q. Now, I show you a wallet which we will have marked S-12 for identification,—

(Wallet received and marked Exhibit S-12 for identification.)

Q. —and the contents in the wallet and ask you whether you recognize that? A. Yes, this is the wallet that we took from Mr. Prince.

Q. I show you a group of business cards which we will have marked S-13 and ask you if you can identify those.

(Cards received and marked Exhibit S-13 for identification, six cards.)

A. These are the business cards that he had in his wallet.

\*        \*        \*        \*        \*        \*        \*        \*

Q. Now, Mr. Andora, did you have any conversations with the defendant Prince concerning the sums of money found on his person on that day? A. Yes, both you and I asked him at the time where he had gotten these moneys from and he said among other things that he had done some betting in New York \* \* \*."

On direct examination, defendant Prince testified:

"Q. Do you know Mr. Gelman? A. Why, yes, I know Mr. Gelman very good.

Q. Does he live in Englewood? A. He does.

Q. What happened; tell us. A. I had opened the door of my house and started in and 'Prince,' he said, 'don't go in; Norman, don't go in.' I stuck my head back out. He said, 'Don't go in the house,' and there was someone else with him.

I said, 'What's the matter?' I backed out of the house and he had two papers. He said, 'I have a search warrant and an arrest warrant.' he said, 'do you want to stay out here or go inside?'

So I said, 'No, let's go inside.'

So I invited him with the other gentleman. So when he got inside he said, 'Empty your pockets.'

I said, 'Wait a minute.' I said, 'I'll read the search warrant first,' and I read it, and started reading.

I saw where it said they were looking for gambling paraphernalia such as adding machines and pads and pencils, so I laughed, I said, 'What's this?' I said, 'Go ahead.'

So then he said, 'Empty out your pockets.'

So I did, I emptied out my pockets.

Q. Where did you put what you had in your pockets? A. I put it on the dining room table."

Thus, the record regarding Prince indicates that the prosecutor's men stopped Prince at his door about 11:15 A. M., searched his person and house for about 30–40 minutes and then took him to the prosecutor's office. We gather that he assumed he was under arrest, but just when the arrest was actually made and how are not explained.

██ Recently, in *State v. Doyle*, 42 *N. J.* 334 (1964), Mr. Justice Francis comprehensively discussed the pertinent prin-

ciples involving a search incidental to an arrest. He pointed out that our present crimes act makes all criminal offenses (other than treason, *N. J. S.* 2A:148–1, and murder, *N. J. S.* 2A:113–1 *et seq.*) misdemeanors or high misdemeanors, *N. J. S.* 2A:85–1 to 12; that all common law offenses of an indictable nature not expressly provided for by statute are denominated misdemeanors, *N. J. S.* 2A:85–1; that misdemeanors are punishable by a fine of not more than $1,000 or imprisonment for not more than three years, or both, *N. J. S.* 2A:85–7; that high misdemeanors, which under the statute are not in any way equated with common law felonies, are punishable generally by a fine of not more than $2,000 or imprisonment for a maximum term of seven years, or both, *N. J. S.* 2A:85–6; and that the absence of a specific "felony" category in our crimes act creates a necessity for decision with respect to the kind of offense which will justify a police officer in arresting without a warrant. In our State statutory authorization for a penalty, of more than a year and in a state prison, is regarded as necessary. *Cf. N. J. S.* 2A:167–15, –17. Misdemeanors under the crimes act, with rare exceptions, being punishable by imprisonment up to three years in state prison are sufficiently equatable with common law felony to justify arrest by a peace officer without a warrant when he has reasonable ground to believe that an offense of that grade is being or has been committed by the person to be apprehended.

Thus, under these guides the crimes here alleged *i. e.,* violations of *N. J. S.* 2A:98–1 and 2, punishable by a fine of not more than $1,000, or by imprisonment for not more than three years, or both, are of such stature as would permit an arrest on probable cause and a search incidental thereto without a warrant.

▆▆▆▆▆ Mr. Justice Francis also pointed out that the right to arrest must pre-exist a search, that officers cannot search in order to arrest, nor arrest because of the product of the search and that a search undertaken merely for the pur-

pose of uncovering evidence with which to arrest and convict of crime is not made lawful because the desired evidence is obtained. Absent a valid search warrant, police authorities must arrest validly in which event they may search reasonably as an incident of the arrest. He also stated that if the arrest without a warrant is lawful, the search and seizure are not invalidated solely because the officers had adequate time to procure a search or arrest warrant.

Mr. Chief Justice Weintraub, as a warning against too much emphasis being given to this issue, pointed out in *State v. Smith,* 37 *N. J.* 481, 484–485 (1962), that:

"We are not dealing with a denial of a right which bears upon the truth of a conviction, as for example, the right to counsel or to appellate review. * * * Rather the subject is evidence, the probative force of which is constant whether it is seized with or without warrant. * * * In short, the fairness of the trial itself and the truth of the verdict are not involved. The constitutional injury lies elsewhere."

We readily deduce from this record that Foti's statement to the police upon his arrest on April 4, 1962 implicating Prince constituted probable cause for arrest of Prince without a warrant. But was the search of the person of Prince incidental to an arrest? In this connection it is unimportant whether the search was made before or after the arrest so long as there was an intent to arrest him without regard to the outcome of the search. Therefore, the question becomes: Was there an intent to arrest regardless of search?

As that issue cannot be decided on the present record, we feel that justice requires a remand to the trial court for a determination. *Cf. State v. Doyle,* 40 *N. J.* 320, 325 (1963). A hearing is directed to be held forthwith and a return of the record and of the trial court's findings shall be sent to us as soon as possible. Briefs shall be filed and exchanged within 30 days after the trial court files its report. In the meantime, we retain jurisdiction.

■ In passing we express our agreement with the following statement of the Appellate Division:

"At the conclusion of the main charge, counsel entered 'a general objection to the whole charge * * * and each and every part thereof.' Such an objection is worthless and preserves nothing for appeal, even if the trial judge acknowledges or even invites it, which, of course, he should not do. R. R. 3:7–7(b); 3:7–8. Defendants attempted to attack portions of the charge in this appeal, on the basis of that general objection. For the reasons stated we refused to consider those attacks."

We emphasize that a general objection should never be made by counsel or directly or impliedly recognized by a trial court.

Finally, defendants complain about the alleged improper cross-examination of Smith, a character witness for defendants Hutchins and Walls. We have considered the cross-examination and find no error therein.

Remanded for proceedings not inconsistent with this opinion.

PROCTOR, J. (dissenting). *State v. Pontery,* 19 *N. J.* 457 (1955), declares that it is improper for a trial court to ask the jury how it stands numerically. The majority agrees that this mandate should be followed. The trial court disregarded this mandate and learned through his interrogation of the jury that they stood deadlocked by a vote of 11 to 1. In my opinion it was reversible error to send the jury back for further deliberation in such circumstances without cautionary instructions as set forth in *State v. Williams,* 39 *N. J.* 471, 481 (1963) (quoted in the majority opinion). This case is controlled by the express language in *Pontery,* 19 *N. J.,* at *p.* 477:

"This form of specific inquiry easily lends itself to suggested or apparent compulsion and should be avoided, especially where, as here, the trial judge returned the jury for further deliberation after having ascertained that they were divided eleven to one. Under the circum-

stances present, the absence of any cautionary instructions was closely akin to unlawful compulsion as set forth in *In re Stern*, 11 *N. J.* 584 (1953)."

I agree with the following language of the Appellate Division:

"When, after it has been announced that there is only one holdout, a judge sends a jury back without a cautionary instruction, it may appear to the dissenter that the judge wants him to agree and will be displeased if he does not. This, to borrow from *Pontery*, is 'closely akin to unlawful compulsion.' It is probably never easy for a juror to stand alone, even when he is convinced he is right and it must be very much more difficult when it appears to him that his dissent may be looked upon with disfavor by the judge. * * *

For four hours, one juror held out; forty minutes after the above colloquy, he capitulated. We cannot avoid the conclusion that it is highly probable that he was finally influenced to vote to convict not only by the arguments of his fellow jurors, but by his impression that the judge wanted him to agree within an hour. So feeling, we must set aside the verdict."

For the above reasons I would reverse the convictions. Mr. Justice Francis joins in this dissent.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, HALL, SCHETTINO and HANEMAN—5.

*For affirmance*—Justice FRANCIS and PROCTOR—2.