291 N.J. Super. 245 (1996)
677 A.2d 250
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SHAWN SMITH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 1996.
Decided June 14, 1996.
*250 Before Judges BAIME, VILLANUEVA and BILDER.
Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Mr. Friedman, of counsel and on the brief).
Frank Muroski, Prosecutor's Agent, argued the cause for respondent (Edward M. Neafsey, Assistant Attorney General, Acting Union County Prosecutor, attorney; Mr. Muroski, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following the denial of his motion to suppress evidence, defendant pled guilty to possession of cocaine within a school zone with intent to distribute (N.J.S.A. 2C:35-7) and was sentenced to four years imprisonment. He appeals on the ground that the police violated his federal and state constitutional rights by engaging in an unlawful search and seizure. We disagree and affirm defendant's conviction.

I.
On February 23, 1993, Detective Robert Hilongos, a highly experienced member of the Elizabeth Police Department, received a telephone call from an informant who had proven reliable in the past by providing information that had led to an arrest and conviction. The informant told the detective that a black male wearing a three-quarter length black jacket and a yellow cap was selling drugs from the lobby of a building located at 400 Irvington Avenue in Elizabeth. According to the informant, the individual was accepting orders in the lobby and retrieving the drugs from *251 apartment 2L. The informant added that the drug seller was using a red Datsun with license number H10 33D. The gist of the conversation was that the drug transactions were taking place while the informant was talking and that the informant was actually witnessing the illegal sales.
Detective Hilongos was familiar with the housing project described by the informant, having executed several search warrants in the area. The officer described the project as a "high narcotic trafficking area." Upon their arrival, the detective and four other officers observed defendant, dressed in a three-quarter length black jacket and wearing a yellow cap, "standing ... on the sidewalk in front of the ... building." They also observed the automobile described by the informant parked across the street from the building.
Because the lobby was partially hidden from view and there was no safe location from which to conduct a surveillance, the police were unable to monitor defendant's movements. Instead, the officers immediately approached defendant and searched him, discovering a set of keys.
While defendant was detained, Detective Hilongos proceeded to apartment 2L. The site manager, Kathy Ryan, was notified and soon arrived at the apartment. After knocking on the door and receiving no response, the detective was approached by Andrea Smith, who lived in a nearby apartment. Smith told the officer the apartment belonged to Stacy Walker, whom she identified as her sister. According to Smith, Walker was in the hospital. This was confirmed by Patricia Wright, another neighbor, who immediately telephoned Walker. Walker, who was pregnant at the time, had been hospitalized for approximately one week due to hypertension.
The details of the telephone conversation involving Walker, Ryan and Hilongos were hotly contested at the motion hearing. Detective Hilongos could not recall whether he advised Walker of her right to refuse to consent to a search, but nevertheless claimed that Walker ultimately granted permission.
*252 Walker testified that she became quite upset during the telephone call because she had never given defendant permission to enter her apartment and was concerned that she would be evicted because of his criminal conduct. She emphasized, however, that no one threatened to evict her, and that, in fact, Ryan disavowed any intent to take such a course. Walker related that Ryan told her the police wished to search her apartment, but that she had the right to refuse. Despite these assurances, Walker testified that she feared she would be evicted if she refused to consent. Although Detective Hilongos allegedly told Walker that the police wished to enter her apartment in order to obtain defendant's wallet, this falsehood apparently played no part in Walker's decision to grant the police permission to search. In any event, Walker conceded that she unequivocally gave the police her consent at some point during the conversation.
Both Smith and Ryan corroborated Walker's account. Ryan added that she told Walker the police would "probably" obtain a warrant if she refused to consent to the search and that she would be responsible for any damages if the officers found it necessary to break down the door to her apartment. Smith emphasized that defendant had forcibly taken from her the keys to Walker's apartment earlier in the day.
Upon obtaining Walker's consent, the police used the keys seized from defendant to gain entry to the apartment. Once inside, they conducted a search and discovered fifty-nine vials of cocaine in the door shelf of the refrigerator. Detective Hilongos then notified the officers detaining defendant, and defendant was formally placed under arrest.
The Law Division judge found that the seizure of the keys from defendant was unlawful because the police lacked probable cause to make an arrest and the search was too intrusive to be categorized as a legitimate frisk for weapons. The judge further concluded, however, that the detention of defendant was proper because it was based on reasonable suspicion, that the search of Walker's apartment and the seizure of the drugs found in the *253 residence were lawful because she had voluntarily consented, and that the keys would have been inevitably discovered during a subsequent lawful search incident to defendant's arrest notwithstanding the initial police illegality. The judge denied defendant's motion to suppress the drugs and the keys on that basis.

II.
We first consider whether the police acted unlawfully when they searched defendant and seized the keys to Walker's apartment. We agree with the Law Division judge's conclusion that the officers' search of defendant exceeded the scope of a permissible frisk for weapons under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The informant had given no indication that the suspect was armed, and the police observed nothing prior to searching defendant that would warrant such a conclusion. See Adams v. Williams, 407 U.S. 143, 147-49, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 618 (1972); State v. Thomas, 110 N.J. 673, 684, 542 A.2d 912 (1988). Detective Hilongos candidly admitted that the object of the officers' search was narcotics. Such conduct is not sanctioned by Terry. See Ybarra v. Illinois, 444 U.S. 85, 93-94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238, 247 (1979). As recently reaffirmed by the United States Supreme Court in Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), the scope of a permissible frisk is "strictly `limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" Id. at 373, 113 S.Ct. at 2136, 124 L.Ed.2d at 344 (quoting Terry v. Ohio, 392 U.S. at 26, 88 S.Ct. at 1882, 20 L.Ed.2d at 908).
We regard the exploratory activity of the police as a search incident to an arrest. Of course, a warrantless search conducted in order to produce grounds for an arrest is invalid, and, "conversely, an arrest without at least contemporaneous probable cause does not become justified by what the subsequent search discloses." State v. Contursi, 44 N.J. 422, 433, 209 A.2d 829 (1965); State v. Hutchins, 43 N.J. 85, 101, 202 A.2d 678 (1964); *254 State v. Doyle, 42 N.J. 334, 342, 200 A.2d 606 (1964). We thus focus upon whether there was probable cause to arrest defendant prior to the search of his person.
Probable cause is an elusive concept heavily dependent upon the particular factual complex. It is more than mere suspicion but less than legal evidence necessary to convict. State v. Mark, 46 N.J. 262, 271, 216 A.2d 377 (1966). It has been described by our Supreme Court as a "well grounded" suspicion that an offense has been committed. State v. Burnett, 42 N.J. 377, 387, 201 A.2d 39 (1964); see also State v. Waltz, 61 N.J. 83, 87, 293 A.2d 167 (1972); State v. Kasabucki, 52 N.J. 110, 116, 244 A.2d 101 (1968); State v. Laws, 50 N.J. 159, 173, 233 A.2d 633 (1967), cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Davis, 50 N.J. 16, 24-25, 231 A.2d 793 (1967), cert. denied, 389 U.S. 1054, 88 S.Ct. 805, 19 L.Ed.2d 852 (1968); State v. Dilley, 49 N.J. 460, 463-64, 231 A.2d 353 (1967). Our courts have eschewed technisms in reviewing factual circumstances to determine whether probable cause exists. State v. Esteves, 93 N.J. 498, 505, 461 A.2d 1128 (1983). Probable cause must be drawn from the "practical considerations of everyday life" as tested by reasonably prudent persons. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949). In dealing with probable cause, "as the very name implies, we are concerned with probabilities." Ibid. We must not forget that resolution of questions regarding whether or not probable cause exists often "involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law, and indeed a value judgment which inevitably reflects the seasoning and experience of the one who judges." State v. Funicello, 60 N.J. 60, 72-73, 286 A.2d 55 (Weintraub, C.J., concurring), cert. denied sub nom. New Jersey v. Presha, 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). It bears repeating that "the common and specialized experience and work-a-day knowledge of police [officers] must be taken into account." State v. Contursi, 44 N.J. at 431, 209 A.2d 829. Abstract contemplation will not suffice *255 because the decisions of police officers often must be made on the spur of the moment and cannot be viewed fairly from the vantage point of twenty-twenty hindsight. The answer must be found "in the tumult of the streets." State v. Gerardo, 53 N.J. 261, 264, 250 A.2d 130 (1969).
Here, "we are dealing with law enforcement efforts to eradicate one of the chief instrumentalities of human catastrophe, the distribution of dangerous drugs." State v. Alvarez, 238 N.J. Super. 560, 565, 570 A.2d 459 (App.Div. 1990). We have described the business of drug trafficking as one "carried on warily and guardedly and in as many different ways and by as many conceivable methods as human ingenuity can devise in order to escape detection." Id. at 565-66, 570 A.2d 459. "That drug abuse constitutes an ancient foe of society does not, of course, detract from the need" to assure protection of Fourth Amendment values. Id. at 566, 570 A.2d 459. We point to the magnitude of the problem merely to emphasize that "`[l]aw enforcement officers have an even higher and more detailed degree of knowledge than judges of the devious ways' of the drug distributor." Ibid. (quoting State v. Contursi, 44 N.J. at 431-32, 209 A.2d 829).
We know from the recurrent nature of the issue that the police often rely upon information received from confidential informants in their efforts to enforce our drug laws. See, e.g., State v. Novembrino, 105 N.J. 95, 519 A.2d 820 (1987); State v. Ebron, 61 N.J. 207, 294 A.2d 1 (1972); State v. Perry, 59 N.J. 383, 283 A.2d 330 (1971). Our Supreme Court has permitted the police to rely on hearsay for the purpose of establishing probable cause, but has insisted that a "substantial basis" for crediting the information received must be established. State v. Novembrino, 105 N.J. at 120-21, 519 A.2d 820. In Novembrino, the Court described in great detail the evolution of constitutional principles dealing with this question. Id. at 110-19, 519 A.2d 820; see also Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 *256 L.Ed.2d 723 (1964). We need not tread on ground so exhaustively covered in that opinion. Suffice it to say, when the assessment of probable cause depends upon information received by the police from a confidential informant, the test is "whether, given all the circumstances ..., including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that" a crime has been or is being committed. Illinois v. Gates, 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548; see also State v. Novembrino, 105 N.J. at 117-18, 122-23, 519 A.2d 820. This "totality of the circumstances" standard was originally formulated to govern the determination of probable cause respecting the issuance of search warrants. It has also been applied in the assessment of probable cause to conduct warrantless searches. See, e.g., State v. Foreshaw, 245 N.J. Super. 166, 176-79, 584 A.2d 832 (App.Div.), certif. denied, 126 N.J. 327, 598 A.2d 886 (1991); State v. Probasco, 220 N.J. Super. 355, 358, 532 A.2d 262 (App.Div. 1987). Since the standard of probable cause to search is essentially no different from that of probable cause to arrest, there is no reason to conclude that the "totality of the circumstances" test does not govern our inquiry in this case. See 2 Wayne R. La Fave, Search and Seizure: A Treatise on the Fourth Amendment, § 3.1(b) at 6-8 (3d ed. 1996) (quoting Comment, 28 U.Chi.L.Rev. 664, 687 (1961)).
While these principles can be stated with disarming ease, their application to concrete factual contexts is not without difficulty. However, we are not without guidance. In State v. Perry, 59 N.J. 383, 283 A.2d 330, the affidavit upon which the search warrant was issued was based on information "from a reliable informant, who ha[d] in the past given reliable information leading to arrests...." Id. at 387, 283 A.2d 330. Our Supreme Court held that the informant's veracity was adequately established by the officer's reference to his past reliability. Id. at 390, 283 A.2d 330. In State v. Ebron, 61 N.J. 207, 294 A.2d 1, the affidavit recited information received from an "informer who had proven reliable in the past." Id. at 211, 294 A.2d 1. The Court concluded that the officer's assertion as to the informant's past reliability satisfied the *257 test for determining the informant's veracity. Id. at 212-13, 294 A.2d 1. More recently, the Court cited Perry and Ebron with approval in determining that an informant's veracity was sufficiently supported by the officer's "unvarnished statement" that he "ha[d] proven reliable in several investigations...." State v. Novembrino, 105 N.J. at 123, 519 A.2d 820.
Against this backdrop, Detective Hilongos' testimony that the informant here had supplied information resulting in an arrest and conviction plainly established the informant's general veracity. The simple and overriding fact is that the Court has accepted less detailed endorsements of an informant as sufficient to satisfy the veracity requirement.
We are also convinced that the informant's "basis of knowledge" was adequately established. As we noted in our recital of the facts, it was reasonably inferable that the informant was observing the drug sales at the very time he was relaying the critical information to Detective Hilongos. Specifically, the officer was asked whether the informant indicated that defendant "was selling [drugs] at the time [the informant] spoke to [him]." Detective Hilongos responded that "[the informant] was saying at that time [defendant] was selling narcotics." Moreover, the information provided by the informant was extensively detailed. The informant set forth details which in all likelihood only one conversant with the criminal activity would know. Detective Hilongos had reason to believe that the information received from the informant was far more reliable than a mere rumor uttered by one of the criminal milieu. See Draper v. United States, 358 U.S. 307, 312-13, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959).
We add that the information received from the informant was bolstered by the observations of the police when they arrived at the scene of the crime. See State v. Ebron, 61 N.J. at 212-13, 294 A.2d 1; see also State v. Probasco, 220 N.J. Super. at 358, 532 A.2d 262 (citing State v. Sainz, 210 N.J. Super. 17, 20-22, 509 A.2d 192 (App.Div. 1986), aff'd, 107 N.J. 283, 526 A.2d 1015 (1987)). The informant's description of defendant's clothing, his modus operandi, *258 and the proximity of the Datsun bearing a license plate number identical to the one described corroborated the informant's account. See Draper v. United States, 358 U.S. at 313, 79 S.Ct. at 333, 3 L.Ed.2d at 332; State v. Foreshaw, 245 N.J. Super. at 177, 584 A.2d 832; State v. Alvarez, 238 N.J. Super. at 566, 570 A.2d 459. Consideration of these factors separately may show no one in itself sufficient, but in combination with the officer's knowledge and experience relating to the "high narcotics trafficking area" in which the crime was committed, the test was met.
We are thus satisfied that the police had probable cause to arrest defendant and that the search was reasonably incident to the arrest. Defendant's motion to suppress the keys was properly denied.

III.
We next address defendant's contention that the search of Walker's apartment contravened the Fourth Amendment as well as New Jersey's counterpart prohibition against unreasonable searches and seizures. We reject this argument for several reasons.

A.
Initially, we find ample support in the record for the Law Division judge's finding that Walker voluntarily consented to the search of her apartment. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). Consent is a well-recognized exception to the rule authorizing the search of a home only when the police obtain a warrant issued upon probable cause by a neutral and detached magistrate. Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (1973); Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Thus, "where a valid consent is given a search may be conducted without a warrant and without probable cause." State v. Douglas, 204 N.J. Super. 265, 276, 498 A.2d 364 (App.Div.), certif. denied, 102 *259 N.J. 378, 508 A.2d 242 (1985) and certif. denied, 102 N.J. 393, 508 A.2d 253 (1986). In order to be valid, such consent must be "voluntarily given, and not the result of duress or coercion, express or implied...." State v. Johnson, 68 N.J. 349, 352, 346 A.2d 66 (1975) (citing Schneckloth v. Bustamonte, 412 U.S. at 248-49, 93 S.Ct. at 2059, 36 L.Ed.2d at 875). In addition, as a matter of state constitutional law, when the prosecution attempts "to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." Id. at 353-54, 346 A.2d 66. Finally, the person from whom consent is obtained must have authority to consent to a search of the premises. State v. Douglas, 204 N.J. Super. at 276, 498 A.2d 364.
Within this analytical framework, there is no question that Walker had the authority to consent to the search of her apartment and that she understood she had the right to refuse to grant her permission. Although we are troubled by Walker's testimony that Ryan told her the police would "probably" obtain a warrant if she refused and that she would be responsible if they found it necessary to break down her door, there is no evidence that Detective Hilongos participated in that part of the conversation or encouraged it. We recognize that consent in the face of a police officer's claim that he possesses a valid warrant is "instinct with coercion," and, thus, not voluntary. See Bumper v. North Carolina, 391 U.S. 543, 548-50, 88 S.Ct. 1788, 1791-92, 20 L.Ed.2d 797, 802-03 (1968). Consent is not valid if it is "no more than acquiescence to a claim of lawful authority." Id. at 549, 88 S.Ct. at 1791, 20 L.Ed.2d at 802; see also Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920, 930 (1979); State v. Dolly, 255 N.J. Super. 278, 285-86, 605 A.2d 238 (App.Div. 1991). We have extended this principle to invalidate searches based upon consent occasioned by threats of police officers to obtain warrants when they lacked probable cause to do so. Compare State v. Cancel, 256 N.J. Super. 430, 433-34, 607 A.2d 199 (App.Div. 1992), certif. denied, 134 N.J. 484, 634 A.2d 530 (1993) *260 with State v. Hladun, 234 N.J. Super. 518, 522-23, 560 A.2d 1348 (Law Div. 1989). But here, the police had probable cause to obtain a warrant, no threat was uttered, and there is no indication that Walker granted permission to search because she believed her refusal would be futile.
We are also troubled by Walker's testimony concerning her fear of eviction. Had the police threatened to evict Walker if she refused consent, we would hold unequivocally that her permission to search was coerced. But the police uttered no such threat, and the site manager clearly disavowed any intent to evict Walker if she refused to consent.
Finally, we are disturbed by the allegation that Detective Hilongos lied to Walker when he told her the police wished to enter her apartment only to obtain defendant's wallet. The Law Division judge found that no such statement was made, and we perceive no sound basis to disturb that finding. We merely add for the sake of completeness that intentional police deception regarding the purpose of a requested search "may be considered along with other factors as part of the totality of circumstances" compelling the conclusion that a consent was involuntary. United States v. Carter, 884 F.2d 368, 375 (8th Cir.1989); see also United States v. Andrews, 746 F.2d 247, 250 (5th Cir.1984), cert. denied, 471 U.S. 1021, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985), overruled on other grounds, United States v. Hurtado, 905 F.2d 74 (5th Cir.1990) (en banc); United States v. Briley, 726 F.2d 1301, 1304 (8th Cir.1984); Alexander v. United States, 390 F.2d 101, 110 (5th Cir.1968). But see United States v. White, 706 F.2d 806, 808 (7th Cir.1983).
What has been said thus far should not be construed as an endorsement of the procedures used by Detective Hilongos to obtain Walker's consent. Clearly, it would have been preferable had the officer apprised Walker of her right to refuse her consent and barred the site manager and Walker's neighbors from speaking. But our organic law requires the police to abide by constitutional principles; it does not necessarily compel good police work. *261 In any event, we conclude that Walker's consent was validly obtained.

B.
We uphold the search of Walker's apartment for another reason. Although we acknowledge that, due to his alleged possessory interest in the drugs seized, defendant had standing to challenge the constitutional validity of the search of Walker's apartment, State v. Alston, 88 N.J. 211, 227-28, 440 A.2d 1311 (1981); see also State v. Mollica, 114 N.J. 329, 339, 554 A.2d 1315 (1989), we find that defendant lacked a sufficient privacy interest in the apartment to support the conclusion that the search violated his constitutional rights. Like its federal counterpart, the state constitution protects only objectively reasonable expectations of privacy. State v. Hempele, 120 N.J. 182, 198-200, 576 A.2d 793 (1990). Such an expectation must be derived from "`general social norms.'" Id. at 200, 576 A.2d 793 (quoting Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744, 751 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). The Law Division judge correctly found that defendant had no right to enter the apartment and had forcibly obtained the key. To hold that defendant may assert a constitutionally protected privacy interest in the very apartment to which he has unlawfully and forcibly gained entry would constitute a raw injustice. See State v. Arias, 283 N.J. Super. 269, 277-81, 661 A.2d 850 (Law Div. 1992) (although he had standing to bring a motion to suppress, defendant "ha[d] no reasonable expectation of privacy in effects left in a home that he commandeered at gunpoint"); see also State v. Lugo, 249 N.J. Super. 565, 568, 592 A.2d 1234 (App.Div. 1991). No "general social norm" would countenance such an expectation on the part of an intruder, and we cannot conceive of how such a claim could possibly be construed as "reasonable." While we recognize that our holding is somewhat in tension with the rationale underlying Alston, it is plain that our Supreme Court did not *262 intend that decision to create a safe haven for criminally inclined trespassers.
Affirmed.