Ima C. BASS, Plaintiff-Appellee,

v.

Esther BARKSDALE, Abram C. Shmerling, and Robert W. Quinn, Defendants-Appellants,

and

The Metropolitan Government of Nashville and Davidson County, Tennessee, and Joseph M. Bistowish, Defendants.

Court of Appeals of Tennessee, Middle Section at Nashville.

Feb. 24, 1984.

Application for Permission to Appeal Denied by Supreme Court May 21, 1984.

John T. Conners, Jr., John A. Day, Boult, Cummins, Conners & Berry, Nashville, for plaintiff-appellee.

Frank Grace, Jr., August C. Winter, Willis & Knight, Nashville, for defendant-appellant Barksdale.

W.W. McNeilly, Jr., John B. Carlson, Watkins, McGugin, McNeilly & Rowan, Nashville, for defendant-appellant Shmerling.

H. Lee Barfield, II, R. Dale Grimes, Bass, Berry & Sims, Nashville, for defendant-appellant Quinn.

## OPINION

LEWIS, Judge.

This is an appeal by defendants Esther Barksdale, Abram C. Shmerling, and Robert W. Quinn from a $300,000 jury verdict in favor of plaintiff Ima C. Bass.

We adopt in part the statement of the case set out in defendant Quinn's brief:

This medical malpractice action was commenced by Ima C. Bass in the Circuit Court for Davidson County, Tennessee, on June 23, 1980, against the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metropolitan Government"), a governmental entity operating a public health department, and Esther Barksdale, a nurse employed by that department. In the original complaint, Mrs. Bass alleged that she had lost her vision as a result of the negligent administration of ethambutol, an anti-tuberculosis drug, to her by those defendants, and she sought $750,000 in damages. Mrs. Bass claimed that these defendants (1) failed to warn her of the risks attendant to the drugs administered, (2) failed to perform proper tests before prescribing the drugs to her, and (3) failed to provide a program for continued testing and supervision of her while receiving the drugs.

An Amended Complaint was filed by plaintiff on September 5, 1980, naming as additional defendants Dr. Abram C. Shmerling, plaintiff's personal physician; Dr. Robert W. Quinn, a physician working part time in the public health department in Nashville; and Dr. Joseph M. Bistowish, the director of the Nashville public health department. The case against Dr. Bistowish was dismissed prior to trial.

In the Amended Complaint, plaintiff alleged that Dr. Shmerling was negligent (1) in prescribing the ethambutol for plaintiff without warning her of the risks attendant to the use of the drugs (2) in not properly testing before prescribing the drugs, (3) in not performing periodic checks or otherwise supervising her treatment after prescribing the drugs, (4) in failing to know or to learn what medications she was taking even though he saw and treated her during the entire time she was on the drugs, and even though she complained to him of a rapid deterioration of her eyesight, (5) in failing, after learning of her deteriorating eyesight, to test or examine her eyes, or otherwise diagnose the cause of her failing vision, and (6) in failing to refer her promptly to other specialists who could have diagnosed the cause of her visual deterioration.

Plaintiff alleged that Dr. Quinn (1) had prescribed the medications for her without having met her, without taking any

history, without warning her of any risks, without performing proper tests, and without providing a program for continued testing and supervision during treatment, and (2) was responsible for supervising Nurse Barksdale and had negligently performed that duty.

Defendants denied all of these various claims and raised various defenses. Defendant Quinn specifically denied any negligence, denied that he had prescribed the ethambutol or had done anything other than sign a prescription form for the drug on behalf of the prescriber, Dr. Shmerling, and denied that he was responsible for supervising Barksdale or any other employee of the health department in connection with the treatment of Mrs. Bass.

Dr. Shmerling denied that he prescribed ethambutol for Mrs. Bass and denied that he had deviated from the standard of care owed to Mrs. Bass.

Nurse Barksdale denied that she failed to perform proper testing before delivering the drugs or to adequately warn Mrs. Bass of the side effects of the drugs.

The case against Nurse Barksdale, Dr. Shmerling, and Dr. Quinn was tried before a jury of twelve persons and the case against the Metropolitan Government was simultaneously tried by the Court. The trial lasted eight days and, at the close of all the proof, motions for directed verdicts made by each of the defendants were denied.

The jury returned a verdict against Nurse Barksdale, Dr. Shmerling, and Dr. Quinn for $300,000. The Court ordered judgment of $20,000 against the Metropolitan Government. The Metropolitan Government has not appealed. Judgment was entered by the Court in accordance with the jury verdict and thereafter Nurse Barksdale, Dr. Shmerling, and Dr. Quinn moved for judgment in accordance with their motions for a directed verdict or, in the alternative, for a new trial. All motions were denied and all defendants have appealed.

Dr. Shmerling had been Mrs. Bass' private physician and treated her for a variety of ailments since January, 1972. In 1973, he diagnosed her as diabetic. The diabetic condition was controlled by a modified diabetic diet and her blood sugar has been well within the acceptable range since the 1973 test. Mrs. Bass also had bilateral cataracts. Mrs. Bass was a good cooperative patient who paid attention to her health and, in Dr. Shmerling's opinion, would have brought to his attention side effects of any drugs if she knew she was experiencing them. In December, 1978, Mrs. Bass developed pneumonia and was hospitalized at Parkview Hospital in Nashville. At the request of Dr. Shmerling, Dr. Haynes, a chest specialist, was called in to see Mrs. Bass. Dr. Haynes requested various tests, including sputum smears and culture. Mrs. Bass was discharged from the hospital on the drug coumadin, a blood thinner designed to reduce the presence of blood clots. Because coumadin is a potentially dangerous drug which can cause unprecipitous bleeding, Mrs. Bass was required to visit Dr. Shmerling's office once a week for a pro-time check. These weekly visits continued into August, 1979. On March 30, 1979, Dr. Shmerling informed Mrs. Bass that he had learned from the health department that the culture taken at the hospital was positive for tuberculosis. He testified that at that time he informed Mrs. Bass that he did not regularly treat tuberculosis patients and that he had a patient three years prior whom he had turned over to the health department for treatment.

Tuberculosis is a communicable disease that is spread by germs known as tubercle bacilli transmitted through the air and by contact from one individual to another. Before the development of effective anti-tuberculosis drugs in the mid-1940s, public health departments identified tuberculosis cases and quarantined the patients in tuberculosis hospitals to prevent spread of the disease to the public. Since the advent of effective drug therapy, most tuberculosis hospitals have been closed and patients are treated on an out-patient basis. Now,

the health department primarily verifies that tuberculosis patients are on medication and under medical supervision. This has been accomplished through status or diagnosis letters known as DLs to private physicians. These DLs request information from the physician treating the patient for tuberculosis. The public health departments furnish free medications to public and private patients. If patients do not have a private physician, the health department also furnishes a physician. In 1979, more than half the tuberculosis patients in the Nashville area were treated by private physicians. The evidence is that while the health department of the Metropolitan Government was available to consult with private physicians upon request, the clinic has never been a peer review committee.

On Friday, March 30, 1979, Dr. Shmerling called the tuberculosis clinic at the public health department in Nashville to obtain free anti-tuberculosis drugs for Mrs. Bass. He talked with Nurse Barksdale, whom he had known for a number of years. Nurse Barksdale was employed as charge nurse of the TB health clinic of the Metropolitan Government. Nurse Barksdale testified that during the telephone conversation, she and Dr. Shmerling discussed the various drugs available for the treatment of tuberculosis and that Dr. Shmerling ordered a standard combination of ethambutol, isoniazid, and vitamin B–6 for Mrs. Bass. She also testified that Dr. Shmerling asked her to deliver the drugs to Mrs. Bass' residence on the following Monday. Dr. Shmerling disputes this, stating that he called the public health department and discussed Mrs. Bass' condition with Nurse Barksdale; that he told Nurse Barksdale that Mrs. Bass had a positive sputum culture and that he had not treated anyone with tuberculosis for several years and was unfamiliar with the drugs used to treat tuberculosis; that he asked Nurse Barksdale if the public health department still accepted patients for treatment of tuberculosis and, if so, he would like them to put Mrs. Bass in their protocol and treat her; that Nurse Barksdale informed him that they still had the program and that she would arrange to have someone go to Mrs. Bass' home on Monday; that he then called Mrs. Bass and informed her that he had talked with the nurse at the public health department who would come to her home to give her medication; and that at this point he believed he had turned Mrs. Bass over to the public health department for treatment of tuberculosis. Dr. Shmerling denied that he prescribed any drugs for Mrs. Bass. He did recall Nurse Barksdale mentioning the drug "INH", which is an abbreviation for isoniazid, and that she may have mentioned some other drugs. Then on Monday, April 2, 1979, Nurse Barksdale prepared three prescription forms for Mrs. Bass' medicine, one prescription for ethambutol and, for some "unknown" reason, two prescriptions for isoniazid. Ethambutol and isoniazid are legend drugs and cannot be distributed without a prescription. Nurse Barksdale went to Dr. Quinn on Monday, April 2nd, informed him of her conversation with Dr. Shmerling the previous Friday, explained who the drugs were for, and told him she wished to deliver them to Mrs. Bass that day. She testified that she told Dr. Quinn that Dr. Shmerling had said he was not familiar with the drugs and that she had informed Dr. Shmerling of the different drugs and possible combinations and that Dr. Shmerling had then ordered the ethambutol and isoniazid, but she had not received a written prescription form from Dr. Shmerling. Dr. Quinn then signed the prescription forms. Dr. Quinn did not question why there were two orders for isoniazid. He did not ask whether Mrs. Bass had any problems or ask Nurse Barksdale to check Mrs. Bass for contraindications and never gave her any other instructions. Dr. Quinn signed the prescription forms but has "no recollection of signing them or the events surrounding the signing of them." The original prescription form, which was furnished to Mrs. Bass' counsel prior to trial, for ethambutol was marked "PRN", which meant that the prescription could be refilled as necessary. One of the isoniazid prescriptions had "PRN" checked and the

other had no markings on the "Refill" line. Nurse Barksdale testified that she had written all three prescriptions to be filled just one time and at the time Dr. Quinn signed the prescription forms, "PRN" had not been checked. Plaintiff's counsel had been furnished by the Metropolitan Government copies of the three prescription forms with "PRN" encircled on each. Neither Dr. Quinn nor Nurse Barksdale were able to explain the alteration of the prescription forms.

On April 2, 1979, Nurse Barksdale went to Mrs. Bass' home to deliver the ethambutol, isoniazid, and vitamin B–6. Mrs. Mai Fulton, Mrs. Bass' sister, was present. The three of them discussed Mrs. Bass' medical history and Nurse Barksdale learned that Mrs. Bass had cataracts. Nurse Barksdale warned Mrs. Bass that the drugs could affect her kidneys and that Mrs. Bass should watch her urine for a red coloring.

The remainder of the conversation among Nurse Barksdale, Mrs. Bass, and Mrs. Fulton is disputed. Mrs. Bass testified that Nurse Barksdale informed her that she had forgotten to bring an eye chart to check Mrs. Bass' vision and then pointed out certain objects in the room asking Mrs. Bass to identify them; that Nurse Barksdale also told her to watch the whites of her eyes and to notify her doctor if they turned yellow; that Nurse Barksdale did not tell her about the symptoms of blurred vision or inform her that her eyes should be checked monthly and that she did not leave any pamphlets or other papers for her to review. Mrs. Fulton confirmed Mrs. Bass' statements. Nurse Barksdale testified that she checked Mrs. Bass' vision with a ten-foot eye chart and recorded the readings as 10/100 in the right eye and 10/50 in the left eye. However, the eye chart that Nurse Barksdale said she used did not have a 10/100 line. Nurse Barksdale also testified that she informed Mrs. Bass to watch for any decreased visual acuity. Mrs. Bass testified that she took the medications as prescribed, checked her urine regularly and the whites of her eyes daily. She developed no kidney problems and the whites of her eyes never turned yellow, at least as long as she could see them. On May 2, 1979, Nurse Webb, also an employee of the public health department, delivered another months supply of the drug to Mrs. Bass. Nurse Webb testified that she checked Mrs. Bass' vision at that time.

It is undisputed in the record that the health department employees who delivered the drugs in June and July did not check Mrs. Bass' vision. The onset of Mrs. Bass' vision loss occurred in mid-July. Mrs. Bass testified that she noticed that she could not see signs hanging over the aisles in grocery stores as well as before, that when she was riding in cars she was unable to read the stop signs at the corner, and that her vision decline was so sudden and rapid that she found she could not see as well after taking a nap as she could before. Mrs. Bass and Mrs. Fulton testified that they assumed that her rapid loss of vision was caused by cataracts even though they had both been informed by her ophthalmologist that vision loss in cataracts was gradual and not abrupt. Mrs. Bass did not notify anyone with the health department of her vision loss and did not tell Dr. Shmerling until her regular appointment on August 21st. Meanwhile, she continued to take the daily dosage of ethambutol. When the monthly supply of ethambutol was delivered to Mrs. Bass on August 9th, the health department employee who delivered the drug should have checked her vision, but did not. There was uncontradicted expert testimony that if vision checks had been performed, her loss of vision could have been detected, the ethambutol stopped, and her vision loss possibly could have been reversed.

On August 21st, Mrs. Bass saw Dr. Shmerling for a regular checkup. She testified that she described her abrupt vision decline to Dr. Shmerling, including loss of vision after naps. Dr. Shmerling admitted that she told him her vision was declining but denied that she told him about the loss of vision after naps, that such information would have aroused his suspicions, and he

would have called her ophthalmologist, Dr. George Bounds.

On September 21st, approximately eight weeks after her vision decline began, Mrs. Bass saw Dr. Bounds. Dr. Bounds could not determine the cause of the vision loss and referred her to Dr. John Warner, a neurologist. Dr. Warner had Mrs. Bass admitted to Baptist Hospital and asked that she bring all of her medication. When he saw that she was taking ethambutol, he immediately concluded that that was the cause of her vision loss. Dr. Bounds agreed.

At the time of these events, Dr. Quinn was sixty six years old and employed by Vanderbilt Medical School as Professor and chairman of the Department of Preventative Medicine. While teaching medical students for some thirty years, Dr. Quinn also cared for tuberculosis patients at Vanderbilt Hospital. In 1979, he was loaned by Vanderbilt to the health department on a half-time basis (twenty hours per week) to serve as director of tuberculosis and venereal disease control. Dr. Quinn testified that of the twenty hours available he could only devote about eight hours per week to tuberculosis patients who came to the clinic for treatment; that during this time his primary duties were to treat clinic patients with venereal disease and tuberculosis but he was also available to consult with private physicians and public health nurses about treatment of their patients.

One of the services of the public health department was to provide a physician for patients who had no doctor and could not afford one. In this way, each tuberculosis patient had a doctor. At times private physicians, who did not desire to treat tuberculosis or did not feel competent to do so, referred their patients to the physician at the public health clinic for treatment.

It is undisputed that Dr. Quinn and Mrs. Bass had no direct personal contact until the trial of this case. Throughout the six-month period of treatment for tuberculosis, Mrs. Bass did not ask Dr. Quinn to treat her and never came to the clinic for any purpose. No member of Mrs. Bass' family asked Dr. Quinn to treat Mrs. Bass. Dr. Shmerling did not communicate with Dr. Quinn concerning the treatment of Mrs. Bass. Dr. Quinn testified that Mrs. Bass "wasn't my patient. I never agreed to take care of her and no one ever asked me to, the patient herself or her physician." Dr. Quinn testified that the signing of a prescription form does not raise the doctor-patient relationship, that it "doesn't amount to assuming responsibility of taking care of the patient."

Dr. Quinn further testified that his only involvement in the case occurred on Monday, April 2, 1979, when he simply signed prescription forms which he understood Dr. Shmerling had ordered for Mrs. Bass in a conversation on the previous Friday with Nurse Barksdale; that each of the prescriptions had the phrase "per telephone order of Dr. Shmerling" handwritten at the top. From the record, it is undisputed that the phrase "PRN" was not circled or marked at the time Dr. Quinn signed the prescription forms. Dr. Quinn testified that, since he knew Dr. Shmerling to be a reputable physician with many years experience and since the prescriptions were for standard drugs, he signed the forms authorizing a thirty-day supply of medication, which included ethambutol.

There is no evidence that prescribing ethambutol for Mrs. Bass was below the standard of care in the community. In fact, the evidence is that ethambutol was an appropriate drug to give Mrs. Bass even though she had cataracts, but because of the cataracts, it was necessary to keep a close watch to determine if there was a vision decline and, if there was a vision decline, to determine if it was attributable to underlying disease or to ethambutol.

Dr. Quinn, in response to request for admissions, admitted that the standard of care in the community in March of 1979 through September, 1979, for a doctor prescribing ethambutol for a patient was to: (1) know or obtain a medical history including a history of visual abnormalities before prescribing the drug; (2) make a physical examination of the patient, including finger

perimetry and testing of color discrimination before prescribing the drug; (3) know the contraindications, the risks, the precautions and the adverse reactions of the drug before prescribing it; (4) give or cause to be given a test of visual acuity using a snellen eye chart before prescribing the drug; (5) test or cause to be tested each of the patient's eyes separately as well as both eyes together before prescribing the drug; (6) weigh the risks and benefits of ethambutol therapy on patients with visual defects such as cataracts before prescribing the drug, (7) give or cause another to give warnings of the risks of treatment of tuberculosis with ethambutol before the patient begins to take the drug, including the risk of loss of vision and temporary loss of vision; (8) tell or cause another to tell the patient who is to receive the ethambutol about what symptoms to watch for that may indicate a decrease in visual acuity and, if the symptoms occur, the course of action to take. The reasons for the precautions with regard to the patient's vision is that a known side effect of ethambutol is an adverse effect on vision and initial testing must be done to be sure that any variations in visual acuity during the drug therapy are not due to underlying disease conditions such as cataracts or optic neuritis.

We first discuss an issue raised by all of the defendants.

They insist that the Trial Judge committed reversible error when he improperly gave a "dynamite charge" to the jury in violation of the rule set forth in *Vanderbilt University v. Steely*, 566 S.W.2d 853 (Tenn. 1978), and *Kersey v. State*, 525 S.W.2d 139 (Tenn.1975).

The record shows that the charge to the jury was completed shortly before lunch. The Trial Judge then allowed the jury to take a lunch break and instructed them to return after lunch to the jury room and begin their deliberations. At 4:00 P.M., after a discussion with the attorneys, the Trial Judge called the jury back into the courtroom. Upon their return, the following transpired:

THE COURT: Mr. McWhorter, it's 4:00, and I thought it might be wise for the Court to inquire what sort of shape the jury's in on this case. I'm not rushing you or anything, but I would like to know what the chances are if any as of this hour in reaching a verdict in this case.

MR. McWHORTER [the jury foreman]: Your Honor, we have been deliberating for quite some time, and we still have one obstacle in our way that is absolutely holding us up. We have got really one person that's holding us back because they cannot truthfully, honestly, I don't think really make a judgment. Everyone else has agreed on everything but that one person.

THE COURT: Well, please don't tell me who it is, but I would like to remind whoever it is on the jury that when I charged you at the end of all the proof— tell her to bring me the—well, I've got it over here. I'll read it right from the charge so that there can be no mistake about it. If you will recall, after I instructed you in the law and at the outset I told you you must follow the law in all those things. Right at the end of the charge the language was as follows: The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. And it is the duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violation to your individual judgment. In other words, you're obligated to really try and deliberate and consult with each other. That's the purpose of the 12-man jury.

Now I don't know how long such a condition has existed and all, but I would hope that whoever the person is that—of course, I can't tell anyone how they should vote and wouldn't dare tell them, and if it was to be objectionalbe to them for reasons of their own, there's nothing I can do about that. But if we don't get

a unanimous verdict, then all of the time that we've spent on the trial up until now has gone down the drain. I'd have to declare a mistrial, and we'd have to try the case all over again. And of course, if justice requires that, we'll do it. But sometimes it seems like we're just wasting the taxpayers' money to come back in and spend another two weeks on a case that we've tried and were so careful to try and get in so we wouldn't have to do that.

Why don't we do this. Mr. McWhorter, let me—and I won't do this if there is any objection from counsel—I would like to suggest that I dismiss you because I told you when you came in here and agreed to serve on the panel I'd let you go at 4:00 unless there's something unusual. Let me dismiss the jury for the day and let you report back in the jury room in the morning at 9:00 and then continue your deliberations. I just hope that all of you understand that the Court isn't trying to tell anybody what to do, but I did charge you as I read a moment ago, and I tried to get that across just as clearly as I can.

Is there anything from counsel before I dismiss them?

MR. McNEILLY: No, sir.

THE COURT: All right. Now for goodness sake don't go out and talk about this trial to anybody now. Just hold off for one more night and everybody get a good night's sleep and think hard about the situation, and we'll see you in here in the morning in the jury room at 9:00.

It is first contended that the Trial Judge erred in failing to caution the jury when they returned to the courtroom not to disclose its division and thereby violated the confidentiality of the jury deliberation.

In *Kersey*, the trial judge elicited from the jury foreman that the jury was "hung eleven to one." Justice Henry, writing for the *Kersey* Court, stated:

We first address the matter of the trial judge making inquiry as to the division of the jury and hold that this is not proper practice. Until the jury shall have reached a verdict, no one—not even the trial judge—has any right, reason or power to question the specifics of its deliberative efforts. We hold that such inquiry is error. *Brasfield v. United States*, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926). Where this inquiry is accompanied by the *Allen* charge or any of its variations, the error is compounded. For text and cases relating to an inquiry as to the division of the jury, see 76 Am.Jur.2d Trial, Sec. 1058 and E. Ledford, Defusing the Dynamite Charge: A Critique of Allen and its Progeny, 36 Tenn.L.Rev. 749 (1969).

Under the inherent and the statutory supervisory power of this Court, we advise the trial bench that when a jury's deliberations have not produced a verdict, and it returns to the courtroom and so reports, the presiding judge should admonish the jury, at the very outset, not to disclose their division or whether they have entertained a prevailing view. The only permissive inquiry is as to progress and the jury may be asked whether it believes it might reach a verdict after further deliberations. If the trial judge feels that further deliberations might be productive, he may give supplemental instructions in accordance with subsequent portions of this opinion. See *State v. Hutchins*, 43 N.J. 85, 202 A.2d 678 (1964).

525 S.W.2d at 141.

■ The Trial Judge erred in failing to admonish the jury upon its return to the courtroom not to divulge its division, but that error, standing alone, is harmless since it does not affirmatively appear that the error affected the results of the trial. Tenn.R.App.P. 36(b). However, here there is more. The *Kersey* Court, after rejecting the dynamite charge or any of its variations, stated as follows:

The instruction contemplated in Sec. 5.4(a) [ABA Standards relating to trial by jury § 5.4] may be given as a part of the main charge and should be given in the following form:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

525 S.W.2d at 145. The *Kersey* Court said that if this instruction is part of the main charge, "it may be repeated should a deadlock develop." *Id.* at 145.

Justice Cooper, in *Vanderbilt University v. Steely*, 566 S.W.2d 853 (Tenn.1975), a civil case, wrote:

The use of a supplemental "dynamite" charge much stronger than that given in the instant case was long sanctioned in Tennessee. *See, e.g., Simmons v. State,* 198 Tenn. 587, 281 S.W.2d 487 (1955). However, that rule was changed in *Kersey v. State,* 525 S.W.2d 139 (Tenn.1975), which set forth strict guidelines governing the form such a charge may take, and the circumstances in which it may be given. *Kersey* held that a supplemental charge may be given only in the form specified in that opinion, and then only when it was given as part of the main charge. Strict adherence to the dictates of *Kersey* is expected, and variations are not permitted. *Kersey v. State, supra,* at 145.

In the instant case, there is no doubt but that the trial judge violated the rule laid down in *Kersey*. First, he did not use the charge mandated by *Kersey*, but his own version of it. Secondly, he gave his charge as a supplemental charge when it had not been included in the main charge. As we noted in *Kersey*, this was "an error of the first magnitude." *Kersey v. State, supra,* at 144.

However, this determination alone does not dispose of the case. An error in the charge of the judge to the jury is not grounds for reversal unless it affirmatively appears that the error has affected the results of the trial. T.C.A. § 27–117. Upon a considered review of the entire record of the cause, we are of the opinion that the supplemental charge was a material factor in persuading the jury to return a verdict, and that the variation between that charge and the *Kersey* charge was a material factor in its having that effect. In particular, the charge given informed the jury that, should they fail to agree, a new trial would be necessary, and emphasized the waste of time, money, and effort this would entail. It contains language that could be interpreted as implying that the jurors had a "duty" to agree. Finally, the entire charge was improperly emphasized by being given for the first time only after the jury had been deadlocked for several hours. We believe that these departures from the *Kersey* standard, when taken collectively, worked to the material prejudice of the petitioner.

*Id.* 566 S.W.2d at 854.

In the instant case the Trial Judge instructed the jury in the main charge:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. And it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment.

The Trial Judge did not give the mandated *Kersey* charge: he gave only a portion of it.

When the jury returned at 4:00 o'clock and voluntarily informed the Trial Judge

that eleven of them had made a decision but that one of their number "was holding us back," the Trial Judge repeated that portion of the *Kersey* charge he had given in the main charge, but added the following:

> In other words, you're obligated to really try and deliberate and consult with each other. That's the purpose of the 12-man jury.
>
> Now I don't know how long such a condition has existed and all, but I would hope that whoever the person is that—of course, I can't tell anyone how they should vote and wouldn't dare tell them, and if it was to be objectionable to them for reasons of their own, there's nothing I can do about that. But if we don't get a unanimous verdict, then all of the time that we've spent on the trial up until now has gone down the drain. I'd have to declare a mistrial, and we'd have to try the case all over again. And of course, if justice requires that, we'll do it. But sometimes it seems like we're just wasting the taxpayers' money to come back in and spend another two weeks on a case that we've tried and were so careful to try and get in so we wouldn't have to do that.

The Trial Judge then sent the jury home for the night with instructions to return the following morning to continue their deliberation.

While the Trial Judge committed "error of the first magnitude," *Kersey*, 525 S.W.2d at 144, this alone is not sufficient to reverse. It must affirmatively appear that the error in the jury charge has affected the results of the trial. Tenn.R.App.P. 36(b); *Vanderbilt University v. Steely*, 566 S.W.2d at 854.

■ We are of the opinion after a review of the record that the failure of the Trial Judge to give the entire *Kersey* charge in the main charge and then to emphasize that partial *Kersey* charge by giving it as a ·supplemental charge to what was perceived to be a "deadlocked" jury was a material factor, particularly when taken with the fact that the Trial Judge informed the jury "all of the time we've spent on the trial up until now has gone down the drain .... we'd have to try the case all over again.... sometimes it seems like we're just wasting the taxpayers' money to come back in and spend another two weeks on a case that we've tried," that resulted in prejudice to the defendants.

■ Nothing should be done or said to a juror which can in any manner be taken by that juror to indicate that he or she should abandon an honestly held conviction in order to reach a verdict so that time and money will be saved.

This issue is sustained.

We next discuss the issues raised by Dr. Quinn.

He contends that "[t]here was no physician-patient relationship between Dr. Quinn and Mrs. Bass, and therefore no duty on which to base a cause of action for malpractice."

■ Before a suit for medical malpractice will lie against a physician by a patient, there must be a physician-patient relationship. *Dunbar v. Strimas*, 632 S.W.2d 558, 562 (Tenn.App.1981); *Osborne v. Frazor*, 58 Tenn.App. 15, 425 S.W.2d 768 (1968).

> The relation of "physician and patient" is created when the professional services of a physician are accepted for a purpose of medical or surgical treatment, the relationship being a contractual one, wherein patient knowingly seeks assistance of a physician and physician knowingly accepts him as a patient. [Citation omitted.]

*Osborne*, 58 Tenn.App. at 20, 425 S.W.2d at 771 (quoting *Findlay v. Board of Supervisors*, 72 Ariz. 58, 230 P.2d 526 (1951)).

Dr. Quinn insists that no consensual relationship existed between him and Mrs. Bass. It is undisputed that Dr. Quinn was never contacted by Mrs. Bass. It is undisputed that Dr. Quinn was never contacted by Dr. Shmerling on Mrs. Bass' behalf for consultation or to refer Mrs. Bass to Dr. Quinn for treatment. Mrs. Bass did not at

any time seek medical services from Dr. Quinn.

Mrs. Bass insists that the rule for determining a physician-patient relationship set out in *Osborne* is too narrow in this day of numerous medical specialties and subspecialties. She points to one of those specialties, radiology, and correctly asserts that every day doctors who specialize in radiology read x-rays for patients whom they have never seen nor talked with and the patient never meets and may never know the name of the radiologist. However, the rule in *Osborne* is broad enough to cover these kinds of situations. It is not necessary under *Osborne* for the physician and patient to have a face-to-face meeting or that they know each other's name. The requirement is that the relationship of physician and patient be contractual and that may arise out of a consultation by the patient's primary physician with another physician when that consultation is for the treatment of the patient.

Mrs. Bass contends that the "Medical Malpractice Review Board and Claims Act of 1975," T.C.A. § 29–26–101, *et seq.* (the Act), expands the *Osborne* rule. She argues the "appropriate standard for determining the presence of relationship of physician and patient is the receipt of medical services test set forth in § 29–26–102(8)." T.C.A. § 29–26–102(8) defines patient as "the person who receives medical services from a health care provider." That Dr. Quinn is a health care provider is without question. T.C.A. § 29–26–102(4). She therefore contends that she as a patient received medical services from Dr. Quinn, a health care provider, when Dr. Quinn signed the prescription forms.

▆ The only contact Dr. Quinn had with Mrs. Bass was the signing of the prescription forms. It is undisputed that Dr. Quinn on April 2nd was informed by Nurse Barksdale that Dr. Shmerling had prescribed ethambutol and isoniazid for Mrs. Bass the previous Friday, but that Nurse Barksdale had not received signed prescription forms from Dr. Shmerling. Nurse Barksdale informed Dr. Quinn that she

wished to visit Mrs. Bass that afternoon and get her started on the medicines Dr. Shmerling had prescribed. In order to facilitate Mrs. Bass' beginning treatment, Dr. Quinn signed the prescription forms. Each form had written at the top "per telephone order Dr. Abe Shmerling." The writing of prescriptions for drugs has been deemed to be a factor in determining whether a person is "practicing medicine." *O'Neil v. State*, 115 Tenn. 427, 90 S.W. 627 (1905). However, the question here is not whether Dr. Quinn was practicing medicine. The question is: did the signing of a prescription form on behalf of a fellow physician create the relationship of physician and patient. Under the circumstances here, we think not.

While Dr. Quinn admitted that only a doctor who prescribes a drug should sign the prescription form, the uncontradicted proof is that the signing of a prescription form for another doctor does not create the relationship of physician and patient. Dr. Quinn may have negligently signed the prescription forms. However, under the circumstances, the mere signing of the forms did not create a physician-patient relationship between Dr. Quinn and Mrs. Bass.

There is no evidence in the record from which it could be found that the relationship of physician-patient existed between Dr. Quinn and Mrs. Bass. The Trial Judge erred in failing to direct a verdict for Dr. Quinn on this issue. If Dr. Quinn was guilty of negligence that proximately caused the injury to Mrs. Bass, it arose not from the physician-patient relationship, but from his duty to supervise Nurse Barksdale.

We next discuss "[w]hether Dr. Quinn had any duty to supervise Nurse Barksdale's activities in the treatment of a person with tuberculosis who is not his patient."

▆ Dr. Quinn argues there is no proof in the record that he "had a duty to supervise Nurse Barksdale's treatment of Mrs. Bass or that he was negligent in the per-

formance of any duty to supervise." We disagree.

Nurse Barksdale testified that she "had charge of all the personnel, directing all the personnel in the Lentz TB Health Clinic" and that she was "supervised by Dr. Quinn" and that "at the time of the Bass affair ... Dr. Quinn was [her] supervisor." While Dr. Quinn denies that it was his duty to supervise Nurse Barksdale and other employees, there is evidence from which the jury could so find. There is evidence in this record from which the jury could find that the failure of Nurse Barksdale to properly inform Mrs. Bass of the side effects of the drugs, to check her visual acuity, and that other employees' failure to check her vision was negligence. While it is disputed, there is evidence from which the jury could find that Dr. Quinn did not exercise his supervisory duties.

If the jury should find that Dr. Quinn had a duty to supervise and that he was negligent in performing his duty to supervise and that negligence proximately caused Mrs. Bass' loss of eyesight, then Dr. Quinn would be answerable to Mrs. Bass in damages. *See Brown & Sons Lumber Co. v. Sessler*, 128 Tenn. 665, 163 S.W. 812 (1913).

■ Dr. Quinn next contends that the Trial Judge erred in instructing the jury as follows:

A physician who prescribes drugs to a patient may delegate to a nurse the duty of performing certain of his obligations by reason of his prescription of the drugs, but cannot delegate the responsibility for such obligation, and accordingly, he is held responsible for the negligent acts and omissions of the nurse under such circumstances. Therefore, if you find that Dr. Quinn prescribed medications for Mrs. Bass and that Mrs. Barksdale was negligent in performing the duties delegated to her by Dr. Quinn as the prescribing physician, then you must find as a matter of law, that Dr. Quinn was also negligent.

In view of our holding that the evidence failed to show that Dr. Quinn was the prescribing physician, this charge was error.

Dr. Quinn next contends that he "cannot be held vicariously liable for the negligence of Nurse Barksdale or other Metropolitan Government employees in this case."

■ We find nothing in the record upon which to base vicarious liability. Both Dr. Quinn and Nurse Barksdale were employees of the Metropolitan Government. Dr. Quinn was Nurse Barksdale's supervisor but not her employer. Dr. Quinn was an intermediate superior employee of Nurse Barksdale and is not liable for negligent acts of omission or commission committed by Nurse Barksdale. Dr. Quinn, as an "intermediate superior employee[,] is to be held to respond only if his personal negligence, in an immediate act or command, was the efficient cause or a coefficient cause of the injury. He is not to be held along with the employer to constructive liability." *Brown & Sons Lumber Co.*, 128 Tenn. at 672, 163 S.W. at 813–814.

Dr. Quinn next contends he "is entitled to a new trial because the Trial Judge improperly and prejudicially commented upon the evidence during trial."

■ The comments complained of are set out in full in the Addendum to this opinion. The remarks were made in response to a request by Dr. Quinn's counsel concerning a ruling by the Court. The rule forbidding a judge during the course of trial to comment upon the evidence is applicable to comments made as an incident to a ruling on an objection. 75 Am.Jur.2d *Trial* § 98 (1974). Comments which do not express an opinion as to the weight of the evidence normally do not constitute prejudicial error.

■ Our review fails to disclose that the comments complained of by Dr. Quinn amount to prejudicial error. However, even if the comments were error, they were invited by Dr. Quinn's counsel. Dr. Quinn will not be heard to complain on appeal when he, through counsel, induced the Court to commit the error. *Norris v.*

*Richards,* 193 Tenn. 450, 458, 246 S.W.2d 81, 85 (1952).

Generally, in the presence of the jury, the best procedure for the trial judge to follow is to merely rule on the objection or motion without comment. If the trial judge feels comment is necessary, it is a simple matter to wait for a recess and, with the jury out, make any comments for the record that he or she feels are necessary. However, in this case, because of the insistence of Dr. Quinn's counsel, the Trial Judge failed to withhold his comments.

■■■■ Dr. Quinn complains that "[t]he jury instructions on contributory negligence is so vague, ambiguous, and erroneous as to mislead the jury and also failed to define the doctrine of remote contributory negligence." The Trial Judge charged:

> Where one is guilty of negligence which contributes in any degree as a proximate cause of his own injuries, then such party cannot recover, but if the injured person's negligence only remotely contributed to his own injuries, then you must reduce the recovery which you would otherwise award in proportion to the injured person's contribution to his own injury.

His complaint is that the charge refers to plaintiff as "one," "such party," and "injured person," but never as "plaintiff." He contends that these are vague and ambiguous terms and the jury "might well have had no idea to whom the doctrine of contributory negligence was applicable." He also complains that "[t]his portion of the charge was immediately preceded by a definition of proximate cause, and was separated from the charge on negligence by charges on expert witnesses and hypothetical questions." He insists that the "combined effect" of these alleged errors "was to render the charge nugatory and to mislead the jury ...." We cannot believe that the jury was in any way misled by referring to Mrs. Bass as "injured person," "such party," or "one," especially in light of the fact that the only person complaining of injuries was the plaintiff Mrs. Bass. It is presumed the jurors understood the

trial court's instructions. *Memphis Street Railway Co. v. Cooper,* 203 Tenn. 425, 313 S.W.2d 444, 449 (1958). The burden is on the complaining party to show otherwise. Dr. Quinn has failed to show that the jury was misled and, in fact, only states that the jury "might well" have been misled.

■■■■ Dr. Quinn also complains that the instructions were not given at an appropriate place during the charge. He does not point out where in the charge this instruction should have been given, nor does he show that it affected the jury's verdict. It is presumed that the jury considered the instructions as a whole. *Monday v. Millsaps,* 37 Tenn.App. 371, 264 S.W.2d 6 (1953).

We are of the opinion Dr. Quinn has failed to show that the Trial Judge's charge on contributory negligence was error and even if it were error, that it more probably than not affected the verdict of the jury. Tenn.R.App.P. 36(b).

■■■■ Dr. Quinn complains that the Trial Judge erred in refusing to charge the jury that "any damages awarded to Mrs. Bass are not income to her within the meaning of federal and state income tax laws, and no income tax will be owed or paid on the amount of the damage awarded." We know of no Tennessee rule requiring a trial judge, in response to a request for instructions, to charge that no income tax will be owed or paid on damages awarded. We decline Dr. Quinn's invitation to adopt such a rule. We have considered each of the other issues raised by Dr. Quinn but, in view of our holding, deem it unnecessary to address them. They are therefore pretermitted.

We next discuss the issues raised by Dr. Shmerling.

He first complains that "[t]he Trial Court erred in overruling [his] motion for a directed verdict at the conclusion of all the proof."

In determining whether a defendant is entitled to a directed verdict, the

> rules require that the trial judges and
> the appellate courts take the strongest

legitimate view of the evidence in favor of the petitioner, allow all reasonable inferences in his favor, discard all countervailing evidence and deny the motion where there is any doubt as to the conclusion to be drawn from the whole evidence. A verdict should be directed only where a reasonable mind could draw but one conclusion. [Citation omitted.]

*Crosslin v. Alsup,* 594 S.W.2d 379, 380 (Tenn.1980).

■ Dr. Shmerling testified that he told Mrs. Bass, after learning that the sputum culture was positive for tuberculosis, that he had not treated a tuberculosis patient in several years, that he had had a tuberculosis patient some three years before but had turned that patient over to the public health department for treatment; that he had called the public health department regarding Mrs. Bass' treatment for tuberculosis and that a nurse would be by on the following Monday to bring her medicine; that he was of the opinion, after talking to Nurse Barksdale, that Nurse Barksdale knew he was relying on the public health department to put Mrs. Bass in their protocol and take over her treatment for tuberculosis. Nurse Barksdale denies that Dr. Shmerling asked that the public health department take over the treatment of Mrs. Bass. She says that while Dr. Shmerling stated he was not familiar with the drugs presently being used in the treatment of tuberculosis, after she and Dr. Shmerling discussed the different drugs, Dr. Shmerling prescribed ethambutol, isoniazid, and B–6 for Mrs. Bass and made arrangements for someone at the public health department to deliver the drugs to Mrs. Bass.

Dr. Shmerling continued to see and treat Mrs. Bass. He admits that it was incumbent upon him as Mrs. Bass' primary physician to determine what drugs she "was on" so that he could more effectively treat her, but that the first time he knew that she "was on" ethambutol was in September, 1979. Mrs. Bass testified that she told Dr. Shmerling of the abrupt loss of her vision, i.e., that there was a marked difference in her vision before and after a nap. Dr.

Shmerling denies this, but states that information would have alerted him that something was seriously wrong with her vision and that he would have referred her to her ophthalmologist.

The Trial Judge correctly refused to direct a verdict.

■ Dr. Shmerling contends that the Trial Court erred in charging the jury that Mrs. Bass could recover for the aggravation of a pre-existing condition. We agree. The evidence is that Mrs. Bass' blindness was caused by optic neuritis. Mrs. Bass had cataracts but there is no proof in the record that she had a pre-existing condition in her optic nerves which was aggravated by the ethambutol.

■ The court's jury instructions should be directly applicable to the facts in evidence. *Tennessee Farmers Mutual Insurance Co. v. Hinson,* 651 S.W.2d 235, 239 (Tenn.App.1983). Since there was no evidence of a pre-existing condition, the Court's instructions were not applicable to the facts in evidence. However, the instruction given by the Trial Judge is a correct statement of the law and "[w]here an instruction to the jury correctly stated the law but had no basis in the facts of the case, the error is generally considered harmless and not ground for reversal." *Noland v. Freeman,* 53 Tenn.App. 644, 385 S.W.2d 310, 313 (1964) (citation omitted).

"A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn.R.App.P. 36(b). The burden is upon the complaining party to show that the error more probably than not affected the judgment. Dr. Shmerling has failed to carry his burden and states only that the error "may have misled the jury."

Dr. Shmerling also contends that the Trial Judge erred in charging the jury that [a]ll physicians involved in the treatment of a patient owe that patient the duty to

exercise ordinary care for the well-being of the patient to the extent of their involvement. *The law requires that these physicians coordinate their efforts and communicate between each other in a manner that best serves their patient's well-being.* The promptness of communication and the type of information which must be relayed should equal the way physicians in good standing and other members of the profession practicing in the same or similar community would act under similar circumstances. [Emphasis added.]

He insists that the emphasized portion of the charge in effect directed the jury to return a verdict against him; that it "implies that if Dr. Shmerling did not communicate with Dr. Quinn he violated a legal duty owed to" Mrs. Bass. He insists that the charge "was not applicable to the facts introduced in evidence and misled the jury."

 The instruction of the Trial Court correctly states the law. When two or more physicians treat a patient, they are required to coordinate their evidence and communicate "in a manner that best serves their patient's well-being." The "extent" of the physician's "involvement" decides what effort he must take to satisfy his obligation to communicate. This is a question of fact which depends upon the standard of care in the community. Dr. Shmerling's testimony is that he was Mrs. Bass' primary physician and that the standard of care in the community required him to know what drugs Mrs. Bass was taking. If the jury believed Dr. Shmerling's contention that he had turned the patient over to the public health department for treatment, it was necessary to communicate in order to determine the type of drugs that were to be prescribed for her treatment of tuberculosis under what he admits is his standard of care in the community.

Here, there was a failure of communication and Mrs. Bass, as a result of that lack of communication, was left without a physician to treat her for tuberculosis and to monitor her response to the anti-tuberculo-

sis drugs. As Dr. DesPrez testified: "Mrs. Bass kind of slipped through the cracks and nobody was the doctor."

The judgment of the Trial Court is reversed and the cause remanded for a new trial for each of the defendants in conformity with this opinion. Costs on appeal are taxed equally to the plaintiff and to each of the defendants.

TODD, P.J., M.S., and CANTRELL, J., concur.

## ADDENDUM

Q. All right, sir. Let's move on to another question. Doctor, you told us on yesterday that—well, first of all you told us two years ago, and it didn't change, well, it hasn't changed yet, that it is true that only a doctor who prescribes a drug was to sign the prescription form. You remember admitting to that, don't you?

A. That's a little bit ambiguous.

Q. Well, my question to you was: You do remember admitting to that, don't you?

A. I suppose I did. I don't remember.

Q. Well, don't you know your lawyer tried to get it changed?

A. I beg your pardon?

Q. Don't you know your lawyer tried to get it changed when this cause began? You were sitting right there when he argued it.

A. I don't know what you're driving at. What is the point?

Q. The point is that your lawyer tried to change—

MR. BARFIELD: If Your Honor please, would you instruct the jury on that matter? I think it is inappropriate for Mr. Conners to ask that question now. Since he's opened the door on that, I think it's only appropriate that you charge the jury, that you instruct the jury as to what was done.

A. I'm not absolutely sure I heard the question. Maybe if I heard the question again—

MR. BARFIELD: Wait a minute Doctor.

THE COURT: Now wait a minute. You know that this is cross-examination, ladies and gentlemen of the jury, and under our system of jurisprudence, regardless of who it is, the Court is obligated to let the attorney who's conducting this cross-examination, they have a wide leeway because this is one of the ways that you can attempt to break down a person's testimony.

What happened was that before the trial was ever started here, requests for admissions and so many other things were asked for and In the request for admissions, the question that Mr. Connors just asked Dr. Quinn, when he submitted that to him several months ago he said, "Yes" to the answer. When we got ready to start the trial, a motion was made to amend that answer. I would not permit that. That's where we are today, so go ahead.

MR. BARFIELD: Now, would you explain the amendment, if Your Honor please. I think you've got to give both sides of—

THE COURT: Well, he wanted to amend and try to take back what he said in his original request for admissions, and I didn't think it would be fair for somebody to be preparing for trial for months with one answer to a question—and it appeared to be pretty simple to the Court, really—to come in here and want to add a lot of explanation to try to give another answer. So that's the reason I ruled as I did.

MR. BARFIELD: Your Honor, I respectfully except what Your Honor has said—

THE COURT: I know you do—

MR. BARFIELD: AND I want to show that for the record.

THE COURT: —and let the record show that he respectfully excepted.