IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
ASSIGNED ON BRIEFS FEBRUARY 22, 2002

## WILLIAM HOWELL STEELE, ET AL. v. RICHARD A. BERKMAN, M.D., ET AL.

**Direct Appeal from the Circuit Court for Davidson County**
**No. 00C-3084; The Honorable Hamilton V. Gayden, Jr., Judge**

---

**No. M2001-02250-COA-R10-CV - Filed August 7, 2002**

---

This appeal arises from a medical malpractice complaint filed by the Appellees in the Circuit Court of Davidson County against the Appellant, six other doctors, and two hospitals. The Appellant filed a motion for summary judgment. The trial court denied the Appellant's motion for summary judgment. The Appellant filed an application for extraordinary appeal with this Court pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. This Court granted the application for extraordinary appeal. For the reasons stated herein, we reverse the trial court's denial of summary judgment against the Appellant.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

Steven E. Anderson, Sara E. Fitzpatrick, Nashville, TN, for Appellant Paul Moots, M.D.

Terry J. Leonard, Camden, TN, for Appellees

## OPINION

### I. Facts and Procedural History

The Appellee, William Howell Steele ("Mr. Steele"), had experienced numbness in his right arm for approximately eight months when he sought medical attention from his local physician, Barry Harrison, M.D. ("Dr. Harrison"). Dr. Harrison ordered Mr. Steele to undergo an MRI of his cervical spine and brain. The MRI indicated that Mr. Steele had an intrinsic lesion on his spinal cord at the C-2 level. Dr. Harrison referred Mr. Steele to William Schooley, M.D. ("Dr. Schooley"), a neurosurgeon at St. Thomas Hospital in Nashville, Tennessee. On August 25, 1998, Dr. Schooley admitted Mr. Steele to St. Thomas Hospital for the purpose of diagnosis and treatment.

On September 11, 1998, Dr. Schooley and Richard Berkman, M.D. ("Dr. Berkman"), a neurosurgeon, performed multiple biopsies of the lesion on Mr. Steele's spinal cord and sent the specimens to the St. Thomas Hospital pathology lab while Mr. Steele waited on the operating table. The pathology lab reported that the specimens were consistent with malignant astrocytoma.[1] Upon receiving this information, Dr. Schooley and Dr. Berkman immediately terminated the operation and did not attempt to remove the lesion. [2] Dr. Schooley had no further involvement in Mr. Steele's treatment following the biopsy, and Dr. Berkman assumed Mr. Steele's treatment.

Shortly after the biopsy, Dr. Berkman received Mr. Steele's final pathology report. The final pathology report indicated that the lesion was an ependymoma[3] rather than a malignant astrocytoma. Dr. Berkman contacted Mahlon Johnson, M.D. ("Dr. Johnson"), a neuropathologist at the Vanderbilt University Medical Center pathology lab, and asked him to render a second opinion. Dr. Berkman sent the specimens to the Vanderbilt University Medical Center pathology lab. On September 14, 1998, Dr. Johnson reviewed the specimens. Dr. Johnson confirmed that the specimens were consistent with a grade-II ependymoma. Dr. Johnson sent a copy of his report to James Elrod, M.D. ("Dr. Elrod"), a pathologist at the St. Thomas Hospital pathology lab.

Dr. Berkman decided to remove Mr. Steele's spinal cord lesion. Dr. Berkman claimed that he explained to Mr. Steele that the surgery carried a high risk of neurologic injury, including paralysis and numbness. Mr. Steele elected to undergo the surgery. On September 17, 1998, Dr. Berkman surgically removed Mr. Steele's spinal cord lesion. The final surgical pathology report confirmed that the lesion removed during the operation was an ependymoma. Dr. Berkman sent the specimens to the Vanderbilt University Medical Center pathology lab, and the diagnosis of ependymoma was again confirmed.

On September 19, 1998, Dr. Berkman consulted Ruth Lamar, M.D. ("Dr. Lamar") for consideration as to post-operative therapy for Mr. Steele. Dr. Lamar recommended external beam radiation therapy. Mr. Steele was discharged from St. Thomas Hospital on September 19, 1998. Mr. Steele claimed that he returned to St. Thomas Hospital on September 28, 1998 for radiation therapy, but Dr. Berkman refused to order a radiation oncology consult or radiation therapy. Dr. Berkman claimed that Mr. Steele did well following the surgery, and he started Mr. Steele on a physical therapy program.

On January 26, 1999, Dr. Berkman saw Mr. Steele for a follow-up visit. Mr. Steele was experiencing numbness in his shoulder and weakness in his right arm. Dr. Berkman ordered an MRI of Mr. Steele's spine and brain. The MRI was performed on February 1, 1999. The MRI of Mr. Steele's spine indicated that he either had a residual lesion on his spinal cord or that the

---

[1]A malignant astrocytoma is typically a non-operable, non-curable cancer.

[2]Removal of a malignant astrocytoma usually results in severe neurologic defects to the patient.

[3]An ependymoma is a tumor involving the membrane lining the cerebral ventricles and the central canal of the spinal cord.

ependymoma had returned. In March, 1999, Dr. Berkman sent more pathology specimens to Dr. Johnson for his review. Dr. Johnson analyzed the specimens and concluded that the ependymoma had the possibility of aggressive growth, or malignancy. Dr. Berkman also contacted the Appellant, Paul Moots, M.D. ("Dr. Moots"), a neurooncologist at Vanderbilt University Medical Center, and requested a second opinion regarding treatment options for Mr. Steele. On March 16, 1999, Dr. Moots wrote a letter to Dr. Berkman stating that optimal management of this type of ependymoma was unknown and setting forth the possible treatment options. Dr. Berkman reviewed the MRI with the neuroradiologist at St. Thomas Hospital and determined that he would not perform further surgery to remove the ependymoma.

In March, 1999, Dr. Berkman referred Mr. Steele to Fred Epstein, M.D. ("Dr. Epstein"), a neurosurgeon at the Beth Israel Medical Center in New York City, for his opinion as to whether surgery to remove the ependymoma was indicated. Once Dr. Berkman referred Mr. Steele to Dr. Epstein, Dr. Berkman did not treat Mr. Steele again as a patient. On May 26, 1999, Mr. Steele met with Dr. Epstein for an examination and evaluation. Dr. Epstein determined that surgery should be performed to remove the ependymoma. Dr. Epstein performed surgery on Mr. Steele. Immediately following the surgery, Dr. Epstein noted that Mr. Steele was doing well neurologically. Mr. Steele then developed a sudden weakness in his upper body, and he was intubated and placed on a ventilator. On June 21, 1999, Dr. Epstein wrote a letter to Dr. Berkman in which he stated that his neuropathologist indicated that the ependymoma was malignant.

On October 24, 2000, Mr. Steele and Julia Steele ("Mrs. Steele" or collectively "the Steeles") filed a complaint in the Circuit Court of Davidson County against Dr. Berkman, Dr. Schooley, Dr. Elrod, Dr. Johnson, Paul Boone, M.D. ("Dr. Boone"), Dr. Lamar, Hugh Tobin, M.D. ("Dr. Tobin"), Dr. Moots, St. Thomas Hospital, and Vanderbilt University Medical Center (collectively "the Defendants"). The complaint alleged that Dr. Berkman, Dr. Schooley, Dr. Elrod, Dr. Johnson, Dr. Boone, Dr. Lamar, and Dr. Tobin negligently performed medical examinations on Mr. Steele, misdiagnosed his condition, and failed to properly treat him. The complaint also alleged that Dr. Moots negligently misdiagnosed Mr. Steele's condition and failed to provide him with appropriate treatment. The complaint stated that as a result of the Defendants' negligence, Mr. Steele had suffered injuries, damages, and losses and Mrs. Steele had suffered loss of consortium and loss of income. On December 15, 2000, Dr. Moots, Dr. Johnson, and Vanderbilt University Medical Center filed an answer. The answer specifically denied that a physician-patient relationship existed between Dr. Moots, Dr. Johnson, and Vanderbilt University Medical Center and Mr. Steele.

On January 24, 2001, Dr. Berkman and Dr. Schooley filed a motion for summary judgment supported by Dr. Berkman's affidavit. In his affidavit, Dr. Berkman stated that he was familiar with the requisite standard of care for physicians performing surgical procedures on the central nervous system in Nashville. Dr. Berkman claimed that Dr. Schooley and he were not negligent nor did they fail to meet the requisite standard of care during the treatment of Mr. Steele. On February 26, 2001, the Steeles filed a response in opposition to the motion for summary judgment supported by the affidavit of Todd Wasserman, M.D. ("Dr. Wasserman"). In his affidavit, Dr. Wasserman stated that he was familiar with the requisite standard of care for physicians practicing in Nashville. Dr.

Wasserman claimed that Dr. Berkman breached the requisite standard of care by failing to obtain a radiation oncology consult for Mr. Steele. On April 16, 2001, the trial court granted the motion for summary judgment in favor of Dr. Schooley and denied the motion for summary judgment against Dr. Berkman.

On May 16, 2001, Dr. Moots, Dr. Johnson, and Vanderbilt University Medical Center filed a motion for summary judgment supported by the affidavits of Dr. Moots and Dr. Johnson. In his affidavit, Dr. Moots stated that he was familiar with the requisite standard of care for a physician practicing neurooncology in Nashville. Dr. Moots claimed that he complied with the requisite standard of care with respect to Mr. Steele. In Dr. Johnson's affidavit, he stated that he complied with the requisite standard of care for a physician practicing neuropathology with respect to the pathology specimens of Mr. Steele. Dr. Moots and Dr. Johnson stated that they did not recommend that Mr. Steele undergo further surgery.

On July 17, 2001, the Steeles filed a response in opposition to the motion for summary judgment supported by the affidavits of Dr. Lamar, Dr. Wasserman, and Mrs. Steele. In Dr. Lamar's affidavit, she stated that she recommended involved field radiation to decrease the recurrence of Mr. Steele's ependymoma. Dr. Lamar claimed that she told Mr. Steele that Dr. Moots should be contacted concerning treatment recommendations, but she was not aware whether Dr. Moots ever saw Mr. Steele. She stated that Dr. Berkman spoke with Dr. Moots, and Dr. Moots relayed to Dr. Berkman a more favorable long-term prognosis. Dr. Lamar stated that Dr. Berkman told the Steeles that he did not feel additional treatment was indicated. In Dr. Wasserman's affidavit, he stated that Mr. Steele should have received a radiation oncology consult and radiation therapy. Dr. Wasserman claimed that Dr. Berkman breached the requisite standard of care by failing to order a radiation oncology consult and radiation therapy for Mr. Steele. In Mrs. Steele's affidavit, she stated that Dr. Berkman refused to order a radiation oncology consult and radiation therapy as a result, in part, of Dr. Moots' recommendation.

On July 20, 2001, the trial court held a hearing on the motion for summary judgment. On July 31, 2001, the trial court granted the motion for summary judgment in favor of Dr. Johnson. On August 16, 2001, the trial court denied the motion for summary judgment against Dr. Moots and Vanderbilt University Medical Center. On September 17, 2001, Dr. Moots filed an application for extraordinary appeal with this Court pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. This Court granted the application for extraordinary appeal.

## II. Standard of Review

Summary judgment is appropriate only where the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993); TENN. R. CIV. P. 56.04. We review the summary judgment motion as a question of law in which our inquiry is *de novo* without a presumption of correctness. See Finister v. Humboldt Gen. Hosp., Inc., 970 S.W.2d 435, 437-38 (Tenn. 1998); Robinson v. Omer, 952 S.W.2d 423, 426 (Tenn. 1997). We must view the evidence and all

reasonable inferences in the light most favorable to the nonmoving party. See Byrd, 847 S.W.2d at 210-11. If both the facts and conclusions to be drawn therefrom permit a reasonable person to reach only one conclusion, then summary judgment is appropriate. See Robinson, 952 S.W.2d at 426; Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

### III. Law and Analysis

The sole issue presented for our review is whether the trial court erred by denying summary judgment against Dr. Moots. In order to make this determination, we must first decide whether a physician-patient relationship existed between Dr. Moots and Mr. Steele. If we find that a physician-patient relationship existed, we must then decide whether the Steeles failed to create an issue of material fact with regard to whether Dr. Moots breached the requisite standard of care.

The existence of a physician-patient relationship is an essential element to maintain a claim for medical malpractice. See Bass v. Barksdale, 671 S.W.2d 476, 486 (Tenn. Ct. App. 1984) (citing Dunbar v. Strimas, 632 S.W.2d 558, 562 (Tenn. Ct. App. 1981); Osborne v. Frazor, 425 S.W.2d 768 (Tenn. Ct. App. 1968)). A physician-patient relationship is created "when the professional services of a physician are accepted for a purpose of medical or surgical treatment, the relation being a contractual one, wherein patient knowingly seeks assistance of a physician and physician knowingly accepts him as a patient." Jennings v. Case, 10 S.W.3d 625, 628 (Tenn. Ct. App. 1999) (citing Findlay v. Board of Supervisors, 230 P.2d 526 (Ariz. 1951)); see also Osborne, 425 S.W.2d at 771. In order to establish a physician-patient relationship, it is not necessary for the doctor and patient to meet in person or even know each other's name. See Bass, 671 S.W.2d at 487. Rather, "the requirement is that the relationship of physician and patient be contractual and that may arise out of a consultation by the patient's primary physician with another physician when that consultation is for the treatment of the patient." Id.

In the case at bar, the Steeles argue that a physician-patient relationship was established between Dr. Moots and Mr. Steele when Dr. Moots made recommendations to Dr. Berkman which Dr. Berkman relied upon and followed. We disagree. Dr. Moots merely offered a recommendation of possible treatment options for Mr. Steele to Dr. Berkman. Dr. Berkman was free to accept or reject Dr. Moots' recommendation. There is no evidence that Dr. Moots knew Mr. Steele or ever spoke with Mr. Steele. Dr. Moots never examined or diagnosed Mr. Steele. Nothing in the record indicates that Dr. Moots was under a contractual obligation with Mr. Steele or with St. Thomas Hospital. Dr. Moots never received payment for his recommendation. Dr. Moots was not an employee of St. Thomas Hospital where Mr. Steele was treated. Due to the foregoing reasons, we fail to find the existence of a physician-patient relationship between Dr. Moots and Mr. Steele.

In order to succeed on a motion for summary judgment, the movant has the burden of proving that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. See Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993). The movant may demonstrate that there are no genuine issues of material fact by either negating an essential element of the non-movant's claim or establishing an affirmative defense. See id. at 215 n.5. Because Dr. Moots has negated an

essential element of the Steeles' medical malpractice claim, the existence of a physician-patient relationship between Dr. Moots and Mr. Steele, we find that summary judgment was appropriate in favor of Dr. Moots. Accordingly, we reverse the trial court's denial of summary judgment against Dr. Moots.

## IV. Conclusion

For the foregoing reasons, the decision of the trial court is reversed. Costs of this appeal are taxed against the Appellees, William Howell Steele and Julia Steele, for which execution may issue if necessary.

_____

_____
ALAN E. HIGHERS, JUDGE